# EX PARTE IN THE MATTER OF MUIR, MASTER OF THE GLENEDEN.

## PETITION FOR A WRIT OF PROHIBITION AND/OR FOR A WRIT OF MANDAMUS.

No. 18, Original. Argued January 7, 1919.—Decided January 17, 1921.

1. Over a privately-owned ship, arrested in the District, and a libel for damages due to a collision alleged to have resulted from negligence of the owner's agents, the District Court has *prima facie* jurisdiction; and a mere allegation that the ship is an admiralty transport in the service of a foreign government is not enough to establish her immunity. P. 532.

2. A foreign government is entitled to appear in the District Court and propound its claim to a vessel in a libel suit upon the ground that the status of the vessel is public and places it beyond the jurisdiction; or its accredited representative may appear in its behalf; or, its claim, if recognized by our executive department, may be presented to the court by a suggestion made by or under authority of the

Attorney General; but the public status of the ship, when in doubt, can not be ·determined upon a mere suggestion of private counsel appearing as *amici curiæ* in behalf of the embassy of the foreign government. P. 532.

3. This court, in its discretion, may decline to issue the writs of prohibition and mandamus to prevent exercise of jurisdiction by the District Court in an admiralty proceeding, where the jurisdiction is merely in doubt and the state of the case is such that the question may well be reconsidered by the District Court and on appeal. P. 534.

Rule discharged and petition dismissed.

THE case is stated in the opinion.

*Mr. John M. Woolsey,* with whom *Mr. J. Parker Kirlin* and *Mr. D. M. Tibbetts* were on the brief, for petitioner:

The *Gleneden* as a British Admiralty transport in the service of the British Government was and is immune from arrest under process of the courts of the United States and should have been released by the United States District Court for the Eastern District of New York on the suggestion filed by counsel for the British Embassy as *amici curiæ.*

The method of proving the status of the *Gleneden* as a British public ship by a suggestion filed in behalf of the British Embassy by counsel appearing as *amici curiæ* was in accordance with the well established practice. *The Roseric,* 254 Fed. Rep. 154; *The Athanasios,* 228 Fed. Rep. 558; *The Maipo,* 252 Fed. Rep. 627; *The Adriatic,* 253 Fed. Rep. 489.

On the facts shown by the suggestion the ship was immune and the District Court should have released her forthwith on that representation. *The Exchange,* 7 Cranch, 116; *The Roseric, supra; The Broadmayne* [1916], Prob. 64; *The Messicano,* 32 T. L. R. 519; *The Erissos* (Lloyd's List, Oct. 24, 1917); *The Crimdon,* 35 T. L. R. 81.

It follows that the District Court exercised an unwar-

ranted assumption of power in retaining the *Gleneden* under process of arrest in order to force the giving of security. For, as the vessel was immune from process, there was no way in which the court could legally force an appearance by the owner of the vessel.

In our jurisprudence jurisdiction can only be obtained by personal service of process or by attachment or arrest of property. *Ex parte Indiana Transportation Co.*, 244 U. S. 456. A ship must be either a public ship or a private ship. *Tucker* v. *Alexandroff*, 183 U. S. 424, 446. If she was a public ship, which is conclusively proved by the suggestion, she was and is immune from process.

It has been held both here and in England that the question of the immunity of a vessel from arrest can be properly raised on an agreement such as that made here to give a bond in the event that the vessel is held not to be immune. *The Florence H*, 248 Fed. Rep. 1012, 1014; *The Roseric, supra; The Crimdon, supra.*

The jurisdiction of this court to grant the relief asked is undoubted. There is not any other remedy. An appeal would not have been possible either to this court or to the Circuit Court of Appeals because the order requiring the giving of a bond was not a final order as against any party to the case.

Considerations of public policy and comity between the Government of the United States and the Government of Great Britain and the necessity for a speedy determination of the important questions here involved require the granting the relief prayed.

*Mr. Homer L. Loomis*, with whom *Mr. Joseph A. Barrett* and *Mr. J. Alvis Grace* were on the brief, for respondent.

*Mr. Frederic R. Coudert* and *Mr. Howard Thayer Kingsbury*, as *amici curiæ*, in behalf of the British Embassy:

522. Argument of amici curiæ for the British Embassy.

As an Admiralty transport, in the public service of the British Government, the *Gleneden* is immune from judicial process. *The Exchange,* 7 Cranch, 116; Moore's Int. Law Dig., vol. 2, p. 576; *Moitez* v. *The South Carolina,* Bee, 422, 17 Fed. Cas. No. 9,697; *Briggs* v. *Light-Boats,* 11 Allen, 157; *The Fidelity,* 9 Ben. 333; affd. 16 Blatchf. 569; *The John McCraken,* 145 Fed. Rep. 705; *The Thomas A. Scott,* 10 L. T. R. (N. S.) 726; *The Tartar,* Moore's Int. Law Dig., vol. 2, p. 577; *The Constitution,* L. R. 4 P. D. 39; *The Parlement Belge,* L. R. 5 P. D. 197, reversing L. R. 4 P. D. 129; *The Maipo,* 252 Fed. Rep. 627; *Young* v. *S. S. Scotia* [1903], A. C. 501; *The Broadmayne* [1916], Prob. 64; *The Messicano,* 32 T. L. R. 519; *The Erissos,* (Lloyd's List, Oct. 24, 1917); *The Crimdon,* 35 T. L. R. 81; *The Roseric,* 254 Fed. Rep. 154. The case of *The Attualita,* 238 Fed. Rep. 909, was distinguished in *The Roseric, supra,* on the ground that it was decided before this country became a co-belligerent.

This court has very recently held that the change in international relations caused by this nation becoming a co-belligerent instead of a neutral alters the relation of the court to cases having an international aspect. See *Watts, Watts & Co.* v. *Unione Austriaca,* 248 U. S. 9.

*The Luigi,* 230 Fed. Rep. 493, was also decided while this country was neutral and no official representations were made therein until after the vessel had been released upon a bond voluntarily given by her private owners.

There is another class of distinguishable cases, in which property belonging to a government has nevertheless been subjected to a lien for salvage or general average when such lien could be enforced without disturbing the possession and control of government representatives. See *The Siren,* 7 Wall. 152; *The Davis,* 10 Wall. 15; *Long* v. *The Tampico,* 16 Fed. Rep. 491; *United States* v. *Wilder,* 3 Sumner, 308; *The Johnson Lighterage Co. No. 24,* 231 Fed. Rep. 365.

The test applied in these cases is whether the private lien can be asserted without interfering with the actual employment of the property in the public service. *The Fidelity, supra.*

Other cases, however, lay down the broader principle that property belonging to a sovereign Government is absolutely immune from local jurisdiction, irrespective of its immediate physical possession. *Hassard v. United States of Mexico,* 29 Misc. 511; 46 App. Div. 623; 173 N. Y. 645; *Vavasseur v. Krupp,* L. R. 9 Ch. D. 351; and see Moore's Int. Law Digest, vol. 2, pp. 591–593.

It may be noted that this rule does not apply where the sovereign consents to be sued (*United States v. Morgan,* 99 Fed. Rep. 570), or to an uncondemned prize brought into a neutral port in violation of neutrality (*The Appam,* 243 U. S. 124).

Counsel also distinguished: *The Charkieh,* L. R. 8 Q. B. 197; L. R. 4 Adm. & Eccl. 59; *Oyster Police Steamers of Maryland,* 31 Fed. Rep. 763; *Workman v. New York City,* 179 U. S. 552; *The Florence H,* 248 Fed. Rep. 1012; *The Prins Frederik,* 2 Dod. 451 (see *The Parlement Belge,* L. R. 5 P. D. 213; *De Haber v. Queen of Portugal,* 17 Q. B. 171); *The Swallow,* Swab. 30; *The Inflexible,* Swab. 32.

The criteria of immunity are government control and dedication to the public service. When government control intervenes, neither ownership nor technical possession fixes liability to process, mesne or final, upon the vessel or her owners. See *The Utopia* [1893], A. C. 492, 499.

In this case the Privy Council referred to *The Parlement Belge, supra,* as an accepted authority, and in *The Castlegate* [1893], A. C. 38, 52, the House of Lords also cited it with approval.

The public importance of the question is not affected by the armistice.

The suggestion of immunity by counsel for the British Embassy is a proper method of procedure, and is conclu-

sive as to the official facts thus stated. *Dillon v. Strathearn S. S. Co.*, 248 U. S. 182..

This court has power to grant appropriate relief in this proceeding and such relief is necessary to meet the situation.

MR. JUSTICE VAN DEVANTER delivered the opinion of the court.

On July 28, 1917, the *Gleneden*, a British steamship privately owned, and the *Giuseppe Verdi*, an Italian steamship similarly owned, came into collision in the Gulf of Lyons, both being seriously damaged. November 7, 1918, the British owner of the *Gleneden* commenced a suit *in rem* in admiralty against the *Giuseppe Verdi* in the District Court for the District of New Jersey to recover damages occasioned by the collision; and a few days later the Italian owner of the *Giuseppe Verdi* commenced a like suit against the *Gleneden* in the District Court for the Eastern District of New York. The libel in each suit attributed the collision entirely to negligence of servants and agents of the owner of the vessel libeled, it being alleged that she was in their charge at the time. When the suits were begun the vessels were within the waters of the United States and each was within the particular district where libeled.

The proceedings in the suit against the *Gleneden* are of immediate concern. After process issued and the vessel was arrested, private counsel for the British Embassy in Washington, appearing as *amici curiæ*, presented to the court a suggestion in writing to the effect that the process under which the vessel was arrested should be quashed and jurisdiction over her declined, because, as was alleged, "the said steamship is an Admiralty transport in the service of the British Government by virtue of a requisition from the Lords Commissioners of the

Admiralty, and is engaged in the business of the British
Government, and under its exclusive direction and con-
trol and is under orders from the British Admiralty to
sail from the Port of New York on or about November 25,
1918, to carry a cargo of wheat belonging and consigned
to the British Government"; because the court "should
not exercise jurisdiction over a vessel in the service of a
co-belligerent foreign government," and because "the
British courts have refused to exercise jurisdiction over
vessels in government service, whether of the British
Government or of allied governments, in the present war,
and that by comity the courts of the United States should
in like manner decline to exercise jurisdiction over vessels
in the service of the British Government." An affidavit
of the master of the vessel affirming the truth of much
that was alleged accompanied the suggestion. The libel-
ant, being cited to show cause why the suggestion should
not be acceded to, responded by objecting that it was
not presented through official channels of the United
States and by denying that the facts were as alleged. A
hearing on the suggestion was had in which the libelant
and counsel for the British Embassy participated,—the
latter only as *amici curiæ*,—and at which the owner of
the *Gleneden* was represented informally, without an ap-
pearance. In the course of the hearing counsel for the
libelant called on the others to submit proof in support
of the allegations in the suggestion, particularly to produce
the ship's articles and other instruments bearing on the
suggested public status of the vessel, and to present the
master for examination; but both the counsel for the
British Embassy and the representative of the owner
refused to do any of these things and insisted that the
court was bound on the mere assertion of the claim of
immunity to quash the process and release the vessel.
The libelant produced the libel in the suit against the
*Giuseppe Verdi*, depositions given in that suit by the

master and other officers of the *Gleneden,* a certificate from the customs officers in New York showing the report and entry of the *Gleneden* on her arrival, and other evidence, all tending measurably to show that the vessel was operated by her owner under a charter party whereby the owner was to keep her properly manned, furnished and equipped, was to assume any liability arising from negligent navigation, and was to bear all loss, injury or damages arising from dangers of the sea, including collision. "On all the facts" thus put before it, the court found that "the *Gleneden* was owned by and was still in the beneficial possession of the Gleneden Steamship Co., Ltd., a private British corporation who, through its servants, was in the actual control of the steamer and of her navigation, but engaged in performing certain more or less public services for the British Crown under a contractual arrangement amounting to the usual or government form of time charter party." The court "decided accordingly that the *Gleneden* was not a public ship in the sense that she was either a government agency or entitled to immunity"; and the suggestion was overruled and an order was entered to the effect that the vessel would be released only on the giving of a bond by the owner securing the claim in litigation or a bond to the marshal conditioned for the return of the vessel when that could be done consistently with the asserted needs of the British Government

Afterwards, on November 29, 1918, the master, appearing specially for the interest of the owner and for the purpose of objecting to the arrest and detention of the vessel, interposed a special claim to the effect that the Gleneden Steamship Company, Limited, was the true and sole owner of the vessel and he as master was her true and lawful bailee; and also interposed therewith a peremptory exception to the jurisdiction of the court on the grounds taken in the suggestion on behalf of the British Embassy. This claim and exception concluded

with a prayer that the process be quashed and the vessel released. The exception was not set down for hearing and remains undisposed of. There was no appearance by either the owner or the master save as just stated; nor was there any appearance by the British Government or by any representative of that government other than through the suggestion which counsel for the Embassy in Washington presented as *amici curiæ.*

After filing the special claim and exception, the master applied to the Circuit Court of Appeals for the Second Circuit for writs of prohibition and mandamus preventing the District Court from exercising further jurisdiction and commanding it to undo what had been done; but the application was denied for reasons which need not be noticed now. 255 Fed. Rep. 24.

A few days later an arrangement was effected whereby an acceptable surety company undertook to enter into and file a stipulation for value in the usual form and in a sum to be named by the libelant, not exceeding $450,000, unless on an intended application to this court for a writ of prohibition the vessel should be held immune from the process under which she was arrested and detained. Following that arrangement, on December 10, 1918, the District Court entered the following order:

"On the annexed agreement for security, and consent of the proctors for the libellant herein, and the record herein, it is

"ORDERED that in order to prevent further delay and expense, the steamship *Gleneden* be and she hereby is allowed to proceed on her voyage and leave the physical custody of the Marshal of the Eastern District of New York, provided, however, that this order does not and shall not be deemed to constitute any withdrawal or quashing of the writ of arrest; and it is

"FURTHER ORDERED that all proceedings herein be stayed and special claimant's or libellant's time to file any other

or further papers herein be extended to and including the 23rd day of December, 1918, and in case application is made for a writ of prohibition to the Supreme Court on or before December 23rd, 1918, all proceedings herein be stayed and the time of the special claimant or of the libellant to file any other or further papers herein be extended until ten (10) days after the entry and service of an order or decree on the final decision of the United States Supreme Court on the said writ of prohibition."

The master thereupon asked leave of this court to file a petition for a writ of prohibition preventing the District Court from proceeding with the suit and from interfering with the *Gleneden* in any manner, and for a writ of mandamus directing that court to vacate the order made when the suggestion on behalf of the British Embassy was overruled and to enter an order releasing the vessel without requiring security,—the grounds advanced in the petition being essentially a repetition of those embodied in the suggestion of counsel for the British Embassy. The requested leave was given, a rule to show cause was issued, a return was made by the District Judge, and counsel have been heard. Whether on the case thus made either of the writs should be granted is the matter to be decided.

The principal question sought to be presented—whether the *Gleneden* is such a public vessel of the British Government as to be exempt from arrest in a civil suit *in rem* in admiralty in a court of the United States—is one of obvious delicacy and importance. No decision by this court up to this time can be said to answer it. The nearest approach is in the case of *The Exchange*, 7 Cranch, 116, where an armed ship of war, owned, manned and controlled by a foreign government at peace with the United States, was held to be so exempt. To apply the principle or doctrine of that decision to the *Gleneden* would be

taking a long step, and the present posture of this litigation is such that we find no occasion to consider whether there is proper warrant for taking it.

It is conceded that the *Gleneden* is not an armed ship of war, and that she is not owned by a foreign government but by a private corporation. In a sense she may be temporarily in the service and under the control of the British Government, but the nature and extent of that service and control are left in uncertainty by the proofs, although the facts evidently are susceptible of being definitely shown.

*Prima facie* the District Court had jurisdiction of the suit and the vessel, *The Belgenland*, 114 U. S. 355, 368–369, and to call that jurisdiction in question was to assume the burden of showing what was in the way of its existence or exertion. Merely to allege that the vessel was in the public service and under the control of the British Government as an admiralty transport was not enough. These were matters which were not within the range of judicial notice and needed to be established in an appropriate way. They were not specially within the knowledge of the libelant, nor did it have any superior means of showing the real facts. Thus from every point of view it was incumbent on those who called the jurisdiction in question to produce whatever proof was needed to sustain their challenge.

As of right the British Government was entitled to appear in the suit, to propound its claim to the vessel and to raise the jurisdictional question. *The Sapphire*, 11 Wall. 164, 167; *The Santissima Trinidad*, 7 Wheat. 283, 353; *Colombia* v. *Cauca Co.*, 190 U. S. 524. Or, with its sanction, its accredited and recognized representative might have appeared and have taken the same steps in its interest. *The Anne*, 3 Wheat. 435, 445–446. And, if there was objection to appearing as a suitor in a foreign court, it was open to that government to make the as-

serted public status and immunity of the vessel the sub-
ject of diplomatic representations to the end that, if that
claim was recognized by the Executive Department of
this government, it might be set forth and supported in
an appropriate suggestion to the court by the Attorney
General, or some law officer acting under his direction.
*The Cassius*, 2 Dall. 365; *The Exchange*, 7 Cranch, 116;
s. c. 16 Fed. Cas. No. 8,786; *The Pizarro*, 19 Fed. Cas.
No. 11,199; *The Constitution*, L. R. 4 P. D. 39; *The Parle-
ment Belge*, L. R. 4 P. D. 129; s. c. L. R. 5 P. D. 197.

But none of these courses was followed. The suggestion
on behalf of the British Embassy was presented by pri-
vate counsel appearing as *amici curiæ*, and not through
the usual official channels. This was a marked departure
from what theretofore had been recognized as the correct
practice (see cases last cited); and in our opinion the
libelant's objection to it was well taken. The reasons
underlying that practice are as applicable and cogent now
as in the beginning, and are sufficiently indicated by ob-
serving that it makes for better international relations,
conforms to diplomatic usage in other matters, accords
to the Executive Department the respect rightly due to
it, and tends to promote harmony of action and uniformity
of decision. See *United States* v. *Lee*, 106 U. S. 196, 209.
Of course, the suggestion as made could not be given the
consideration and weight claimed for it.

From all that has been said it is apparent that the status
of the *Gleneden*, judged in the light of what was done
and shown in the District Court, is at best doubtful and
uncertain, both as matter of fact and in point of law. The
jurisdiction of that court is correspondingly in doubt, for
it turns on the status of the vessel. The suit is still in
the interlocutory stage. The court may take up again
the question of its jurisdiction. If it does, the inquiry
may proceed on other lines and the facts may be brought
out more fully than before. In addition, the question

may be reëxamined in regular course on an appeal from the final decree.

The power of this court, under § 234 of the Judicial Code, to issue writs of prohibition to the District Courts, when proceeding as courts of admiralty, to prevent an unlawful assumption or exercise of jurisdiction, is not debatable. But this power, like others, is to be exerted in accordance with principles which are well settled. In some instances, as where the absence of jurisdiction is plain, the writ goes as a matter of right. *Ex parte Phenix Insurance Co.*, 118 U. S. 610, 626; *Ex parte Indiana Transportation Co.*, 244 U. S. 456. In others, as where the existence or absence of jurisdiction is in doubt, the granting or refusal of the writ is discretionary. *In re Cooper*, 143 U. S. 472, 485; *In re New York & Porto Rico S. S. Co.*, 155 U. S. 523, 531; *In re Alix*, 166 U. S. 136. And see *Ex parte Gordon*, 104 U. S. 515, 518–519; *The Charkieh*, L. R. 8 Q. B. 197.

Here the most that can be said against the District Court's jurisdiction is that it is in doubt; and in other respects the situation is such that we deem it a proper exercise of discretion to refuse the writ. Nothing need be added to show that the request for a writ of mandamus is on no better footing. *In re Morrison*, 147 U. S. 14, 26; *Ex parte Oklahoma*, 220 U. S. 191, 209; *Ex parte Roe*, 234 U. S. 70.

*Rule discharged and petition dismissed.*