## OLIVER AMERICAN TRADING CO., Inc., v. GOVERNMENT OF THE UNITED STATES OF MEXICO et al.

(Circuit Court of Appeals, Second Circuit. December 15, 1924.)

No. 96.

1. **International law ⚖➡10—Suit against the United States of Mexico and government instrumentality held not maintainable, in view of defendant's sovereignty.**

Suit against United States of Mexico and National Railways of Mexico, a government instrumentality, to recover for railroad property seized and retained by defendants, *held* not maintainable, in view of independent sovereignty of defendant notwithstanding it was instituted at time when diplomatic relation between United States of America and defendant sovereign had been interrupted; plaintiff's rights being controlled by treaty proclaimed on March 3, 1924, arts. 1, 8.

2. **States ⚖➡191(1)—United States ⚖➡125— Neither the United States nor any individual state can be sued in any state or federal court without its consent.**

Neither the United States nor any individual state can be sued in any state or federal court without its consent.

3. **States ⚖➡191(1)—Consent of state to be sued may be withdrawn, even though pending suits are defeated thereby.**

Consent of state to be sued may be withdrawn, even though pending suits are defeated thereby.

4. **International law ⚖➡10—Mexican government, operating National Railways of Mexico, is engaged in governmental enterprise, as affects its liability to suit.**

The Mexican government, operating National Railways of Mexico, is engaged in a governmental enterprise, as affects its liability to suit.

5. **Evidence ⚖➡26—Courts take judicial notice that in leading countries of Europe and in Canada it is the practice of governments to own and operate railways.**

Courts take judicial notice that in leading countries of Europe and in Canada it is the

practice of governments to own and operate railways.

**6. Appeal and error ⊕⟿714(1)—Facts not appearing of record, and not even alleged to be true, held not entitled to consideration on appeal.**

On appeal from order. sustaining motion to vacate attachment and dismiss suit, facts not appearing in record, but which plaintiff thinks it can prove, if case goes to trial, and which it does not even allege to be true, must be disregarded.

In Error to the District Court of the United States for the Southern District of New York.

Action by the Oliver American Trading Company, Inc., against the Government of the United States of Mexico and the National Railways of Mexico. To review an order vacating an attachment and dismissing suit, plaintiff brings error. Affirmed.

Robert F. Greacen and Alfred Hayes, both of New York City, for plaintiff in error.

Hardin & Hess, of New York City (Jerome S. Hess, Harold B. Elgar, and Ernest Angell, all of New York City, of counsel), for defendants in error.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge. This is an action at law for damages arising out of an alleged breach of contract in which the amount in controversy is $1,164,348.90. The suit was commenced on October 18, 1922, in the Supreme Court of New York. Service was made by attaching tangible personal property and credits within the state alleged to belong to the defendants and summons. Thereupon the government of Mexico appeared specially in the action and seasonably moved to vacate the attachment and to dismiss the suit. Before the motion was heard the case was removed by the defendants to the United States District Court for the Southern District of New York. Mexico then appeared in that court specially and procured a rule that the plaintiff show cause why the attachment should not be vacated and the suit dismissed, upon the ground that it is "an independent sovereign nation" and as such immune from process of the courts except upon its consent. Before this motion was decided the government of Mexico was duly recognized by the United States of America, and diplomatic relations between the two governments, which had been interrupted, and were interrupted at the time the suit was brought, had been resumed. The District Court, having these facts before it,

vacated the attachment previously granted, vacated and set aside any levy made thereunder, and declined to exercise further jurisdiction of the suit and dismissed the action. This ruling was thereupon certified by the District Court to the Supreme Court of the United States. This certificate it granted, as it supposed, in conformity with section 238 of the Judicial Code (Comp. St. § 1215) which is set forth in the margin.[1]

The Supreme Court, however, held the case was not one which was properly before it, and that the writ of error from that court had been improvidently allowed, and directed that the case should be transferred to this court. This it did in conformity with section 238 (a) of the Judicial Code, as added by Act Sept. 14, 1922, c. 305, 42 Stat. 837 (Comp. St. Ann. Supp. 1923, § 1215a), which may also be found in the margin.[2]

The Supreme Court (Oliver American Trading Co. v. United States of Mexico, 264 U. S. 440, 44 S. Ct. 390, 68 L. Ed. 778), holding that the case was improperly before it, said: "The fact that the District Judge issued the certificate does not relieve this court from the duty of determining for itself whether the question which was certified is in truth one of the jurisdiction of the lower

---

[1] "Sec. 238. Appeals and writs of error may be taken from the District Courts, including the United States District Court for Hawaii, direct to the Supreme Court in the following cases: In any case in which the jurisdiction of the court is in issue, in which case the question of jurisdiction alone shall be certified to the Supreme Court from the court below for decision; from the final sentences and decrees in prize causes; in any case that involves the construction or application of the Constitution of the United States; in any case in which the constitutionality of any law of the United States, or the validity or construction of any treaty made under its authority is drawn in question; and in any case in which the Constitution or law of a state is claimed to be in contravention of the Constitution of the United States." 36 Stat. 1157.

[2] If an appeal or writ of error has been 'or shall be taken to, or issued out of, any Circuit Court of Appeals in a case wherein such appeal or writ of error should have been taken to or issued out of the Supreme Court; or if an appeal or writ of error has been or shall be taken to, or issued out of, the Supreme Court in a case wherein such appeal or writ of error should have been taken to, or issued out of, a Circuit Court of Appeals, such appeal or writ of error shall not for such reason be dismissed, but shall be transferred to the proper court, which shall thereupon be possessed of the same and shall proceed to the determination thereof, with the same force and effect as if such appeal or writ of error had been duly taken to, or issued out of, the court to which it is so transferred."

court as a federal court. Bogart v. Southern Pacific Co., 228 U. S. 137, 144; Smith v. Apple, 264 U. S. 274. Such a question is presented whenever there is in controversy the power of the court, as defined or limited by the Constitution or statutes of the United States, to hear and determine the cause. The Pesaro, 255 U. S. 216, 218. It is not presented where the question of jurisdiction to be decided turns upon matters of general law, applicable alike to actions brought in other tribunals. De Rees v. Costaguta, 254 U. S. 166, 173. The question of sovereign immunity is such a question of general law, applicable as fully to suits in the state courts as to those prosecuted in the courts of the United States."

[1] The plaintiff is a Delaware corporation—all the stock of which is owned by H. F. Oliver, an American citizen. The action was commenced by attachment and the service of a summons by the sheriff of the county of New York, together with notice that judgment would be taken for $1,164,348.90, upon the defendant, the government of the United States of Mexico. The National Railways of Mexico was also made a party defendant. The summons and notice were served on the government of Mexico by service upon its managing agent transacting business at the office of the financial agency of Mexico in the city of New York, and they were served upon the National Railways of Mexico by service upon its managing agent, another individual, who it is alleged was regularly transacting business at the office of such railways, also in the city of New York.

While the action is nominally against both the government of Mexico and the National Railways of Mexico, it is in reality a suit only against the Mexican government. For it appears that the National Railways of Mexico is "merely a name" for a system of railroads in the possession of the Mexican government, and has been controlled and operated by Mexico since 1914 for national purposes, just as it operates the Post Office, the Customs Service, or any other branch of the national government.

This, then, is an action in personam, directed against the United States of Mexico, to recover damages for acts committed by it in Mexico. Process was served upon certain representatives of that government in the United States, and attachment levied upon such of the public property of that nation as the plaintiff has been able to find in this country.

It appears that the plaintiff, an American corporation, since its organization in 1915, has been engaged in the transaction of business in the United States and in Mexico. It claims that in January, 1921, it entered into a written agreement with the defendants by which the latter agreed to pay it a certain amount of money for each 1,000 pounds of tractive effort of each locomotive which the plaintiff then had or which it should thereafter place in service upon the railroad lines upon the National Railways of Mexico. The plaintiff also claims that it had in its possession in Mexico certain railway freight cars, which the defendants took possession of and used for military, freight, postal, express, and other similar purposes, and for which they became liable to pay to the plaintiff a reasonable rental. It also claims that the government of Mexico illegally placed an embargo upon all the plaintiff's locomotives in Mexico, which prevented it from removing any of the locomotives from Mexico, and which the courts of Mexico held to be illegal, but which the government of that country has nevertheless refused to release from the embargo, and continues to hold to the plaintiff's damage.

It further alleges that the defendants have wrongfully repudiated their contract with it, and have forced the plaintiff to discontinue the profitable business which it had theretofore conducted in Mexico, with a resulting loss of its clientéle, its credit, and good will; and it is alleged that on account of the defaults of the defendants they are justly indebted to the plaintiff in the sum of $1,164,-348.90.

It appears that the government of Mexico never appeared in this action either in the New York Supreme Court or in the United States District Court, but, on the contrary, has continually protested the jurisdiction of the said courts over its person and property. Such appearances as it has made have been special appearances, made to raise the sole question of jurisdiction.

At the time this suit was commenced the government of Mexico was a de facto government, which had not been recognized by the United States of America. But before the final order of the United States District Court, which is the order complained of, was entered, the government of the United States had accorded complete and unconditional recognition to the government of Mexico. It is contended that, as the suit was commenced and the jurisdiction of the court fully attached prior to the recognition of Mexico, its jurisdiction was not divested by the occurrence of that event.

[2, 3] In this country it has always been

held as an attribute of sovereignty that the United States cannot be sued without its consent. United States v. McLemore, 4 How. 286, 11 L. Ed. 977; Hill v. United States, 9 How. 386, 13 L. Ed. 185; United States v. Clarke, 8 Pet. 444, 8 L. Ed. 1001; United States v. Eckford, 6 Wall. 484, 18 L. Ed. 920; Case v. Terrell, 11 Wall. 199, 20 L. Ed. 134. It is also true that a state of the United States cannot be sued in its own courts, or in the courts of one of the other states, or in the federal courts, by an individual, without its consent. Beers v. Arkansas, 20 How. 527, 15 L. Ed. 991; McArthur Bros. Co. v. Commonwealth, 197 Mass. 137, 83 N. E. 334; Sanders v. Saxton, 182 N. Y. 477, 75 N. E. 529, 1 L. R. A. (N. S.) 727, 108 Am. St. Rep. 826. And it has been held that the consent of a state to be sued, being voluntary, may be withdrawn by the state whenever it sees fit, even though pending suits are thereby defeated. Beers v. Arkansas, supra; Railroad Company v. Alabama, 101 U. S. 832; Ex parte State, 52 Ala. 231, 23 Am. Rep. 567. Therefore, upon the repeal of a statute authorizing the suit, the court in which the suit is pending can proceed no further.

In Memphis & C. R. Co. v. Tennessee, 101 U. S. 337, 339 (25 L. Ed. 960), Chief Justice Waite declared that "the principle is elementary that a state cannot be sued in its own courts without its consent. This is a privilege of sovereignty." The court in that case held that if, at the time a contract is made, a statute gives the right to sue the state, the subsequent repeal of the statute is not unconstitutional, as impairing the obligation of the contract. This conclusion was reached in view of the fact that a statute which merely confers a right to sue the states does not give a complete judicial remedy. It merely enables the claim to be judicially ascertained, and "there the power of the court ends."

In 1794 the French Governor of Guadeloupe was arrested in the United States for an official act committed in his own country. The matter was referred to the Attorney General, who advised that the official ought not to answer in our courts and that the extent of his authority could be determined only by the constituted authorities of his own nation. 1 Op. Attys. Gen. 45, 46. And in 1797, in another case, the Attorney General advised that "a person acting under a commission from the sovereign of a foreign state is not amenable for what he does, in pursuance of his commission, to any tribunal of the United States." 1 Op. Attys. Gen. 81.

In such cases the presumption is that for illegal acts committed in a foreign state the judicial tribunals of that state will afford proper redress. If he applies for such redress, and it is improperly denied him, he may resort to the executive department, but not to the judicial department, of his own government for its aid. In 1871 the Attorney General advised the Secretary of State that "it has often been laid down that, before a citizen of one country is entitled to the aid of his government in obtaining redress for wrongs done him by another government, he must have sought redress in vain from the tribunals of the offending power." 13 Op. Attys. Gen. 550.

In Underhill v. Hernandez, 65 F. 577, 13 C. C. A. 51, 38 L. R. A. 405, this court, in 1895, held in effect that the military or civil agents of foreign governments, whether such governments are de jure or de facto, cannot be held responsible in any court of the United States for acts done within their own states in the exercise of the sovereignty thereof. The plaintiff was a citizen of the United States, and he sued the defendant for false imprisonment and assault and battery committed by the defendant in Venezuela— the defendant being the civil and military chief of the revolutionary party which had taken possession of the capitol of that country. In the course of the opinion of the court, Judge Wallace stated:

"Considerations of comity, and of the highest expediency, require that the conduct of states, whether in transactions with other states or with individuals, their own citizens or foreign citizens, should not be called in question by the legal tribunals of another jurisdiction. The citizens of a state have an adequate redress for any grievances at its hands by an appeal to the courts or the other departments of their own government. Foreign citizens can rely upon the intervention of their respective governments to redress their wrongs, even by a resort, if necessary, to the arbitrament of war. It would be not only offensive and unnecessary, but it would imperil the amicable relations between governments and vex the peace of nations, to permit the sovereign acts or political transactions of states to be subjected to the examination of the legal tribunals of other states."

The case was carried to the Supreme Court and was there affirmed. In the opinion in that court, Chief Justice Fuller said: "Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in

judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves." Underhill v. Hernandez, 168 U. S. 250, 252, 18 S. Ct. 83, 84, 43 L. Ed. 456.

And in Oetjen v. Central Leather Co., 246 U. S. 297, 303, 38 S. Ct. 309, 62 L. Ed. 726, the statement above quoted from the opinion in Underhill v. Hernandez, supra, was cited with approval. The same case was also approvingly cited in American Banana Co. v. United Fruit Co., 213 U. S. 347, 358, 29 S. Ct. 511, 512, 53 L. Ed. 826, 16 Ann. Cas. 1047. In the latter case the court declared (at page 356) that the general and almost universal rule is that the character of an act as lawful or unlawful must be determined wholly by the law of the country where the act is done. And the court added: "For another jurisdiction, if it should happen to lay hold of the actor, to treat him according to its own notions, rather than those of the place where he did the acts, not only would be unjust, but would be an interference with the authority of another sovereign, contrary to the comity of nations, which the other state concerned justly might resent."

In 1813 the Supreme Court, in The Exchange, 7 Cranch, 116, 3 L. Ed. 287, affirmed the action of the Circuit Court for the District of Pennsylvania, which dismissed a libel which had been filed against a government vessel which was claimed by the emperor of France. In that case Chief Justice Marshall, after saying that it involved a very delicate and important inquiry, went on to discuss territorial jurisdiction and said:

"This full and absolute territorial jurisdiction being alike the attribute of every sovereign, and being incapable of conferring extraterritorial power, would not seem to contemplate foreign sovereigns nor their sovereign rights as its objects. One sovereign being in no respect amenable to another, and being bound by obligations of the highest character not to degrade the dignity of his nation, by placing himself or its sovereign rights within the jurisdiction of another, can be supposed to enter a foreign territory only under an express license, or in the confidence that the immunities belonging to his independent sovereign station, though not expressly stipulated, are reserved by implication, and will be extended to him. This perfect equality and absolute independence of sovereigns, and this common interest impelling them to mutual intercourse, and an interchange of good offices with each other, have

given rise to a class of cases in which every sovereign is understood to waive the exercise of a part of that complete exclusive territorial jurisdiction, which has been stated to be the attribute of every nation."

And in 1824, in Osborn v. U. S. Bank, 9 Wheat. 738, 869, 6 L. Ed. 204, Chief Justice Marshall assumed as an axiom that "an independent foreign sovereign cannot be sued."

In Briggs v. Light Boat, 93 Mass. 157, the Supreme Court of Massachusetts in a very elaborate and learned opinion discussed the law relating to the jurisdiction of the courts over property held by the sovereign for public uses. It reviews the English and American cases quite fully in an opinion which has been commented on favorably in the courts of this country and in England. In his opinion Justice Gray (afterwards of the Supreme Court of the United States) stated that a foreign sovereign is not subject to suit in England for acts done in his sovereign capacity in his own country, even though himself a born subject of England and a peer of the realm, and having as such taken the oath of allegiance and sat in the House of Lords, though at the time of suit actually resident in England. He cited Duke of Brunswick v. King of Hanover, 6 Beav. 1; s. c., 2 H. L. Cas. 1.

In 1908 the Supreme Judicial Court of Massachusetts had before it Mason v. Intercolonial Railway of Canada, 197 Mass. 349, 83 N. E. 876, 16 L. R. A. (N. S.) 276, 125 Am. St. Rep. 371, 14 Ann. Cas. 574. The action was brought in a Massachusetts court to recover damages for personal injuries received by the plaintiff while a passenger on the railroad in Canada. The suit was begun by trustee process against certain persons who had in their possession effects and credits belonging to the railway. The defendant did not appear. But a member of the bar of Massachusetts, as a friend of the court, brought before it the suggestion that the action be dismissed on the ground that the railroad described in the writ of the defendant was the property of the king of the United Kingdom of Great Britain and Ireland, and that it was owned and operated by him through his government of Canada for the public purposes of Canada. These facts being made to appear, the court below dismissed the suit, and this was affirmed by the Supreme Judicial Court of Massachusetts.

Chief Justice Knowlton, writing for the court, after stating the facts, said: " * * * The question at once arises whether the court has jurisdiction of a suit which

is virtually against the king of a foreign country. An answer in the negative comes almost as quickly." After reviewing the authorities he stated the conclusion of the court as follows: "The principles which have long been recognized as applicable to the dealings of all nations with one another, as well as the formal decisions of the courts, make it plain that this action must be dismissed for want of jurisdiction. The plaintiff must seek her remedy in the courts of the country in which she received her injury, where there is a statutory provision for such cases."

In the above case the tort was committed in Canada and funds of the railway, and therefore of Canada, were attached in Massachusetts. In the instant case the breach of contract was committed in Mexico, and property of the government of Mexico was attached in New York.

It also appears that the Court of Queen's Bench has held that property of a foreign sovereign in England cannot be taken upon a process of foreign attachment. Wadsworth v. Queen of Spain and De Haber v. Queen of Portugal, 17 Q. B. 171.

In The Parlement Belge, L. R. (1879–80) 5 Prob. D. 197, the Court of Appeal in England had before it an appeal from a decision of Sir. R. J. Phillimore. Proceedings in rem had been instituted against the Parlement Belge to recover damages caused by a collision. The Attorney General filed a protest, asserting that the court had no jurisdiction to entertain the suit as the vessel was the property of the king of the Belgians. It appeared that the boat was a mail packet and was officered by officers of the Royal Belgian Navy, and that, besides carrying mail, she carried merchandise and passengers and their luggage for hire. In the court below Sir Robert Phillimore sustained the right of the court to exercise jurisdiction, being of opinion that neither upon principle, precedent, nor analogy of general international law would he be warranted in holding the vessel exempt from process. The case was taken to the Court of Appeal, where it was unanimously reversed.

In his opinion in the Court of Appeal, Brett, L. J., stated the first question raised as follows: "Whether part of the public property of every sovereign authority in use for national purposes is not as much exempt from the jurisdiction of every court as is the person of every sovereign." He then went on in a full and carefully prepared opinion to consider the matter. After calling attention to the fact that it is a part of the law of nations that the person of the sovereign is exempt from adverse suit, and that in the same way some property of every sovereign is admitted to be a part of the law of nations he stated that "the universal agreement which has made these propositions part of the law of nations has been an implied agreement." He then considered whether the law of nations exempts all the public property of a state which is destined to the use of the state, and declared that the answer depended on "whether the principle, on which the agreement has been implied, is as applicable to all that other public property of a sovereign or state as to the public property which is admitted to be exempt. If the principle be equally applicable to all public property used as such, then the agreement to exempt ought to be implied with regard to all such public property. If the principle only applies to the property which is admitted to be exempt, then we have no right to extend the exemption."

He reviewed at length the English and American authorities and stated the conclusion of the Court of Appeal as follows: "The principle to be deduced from all these cases is that, as a consequence of the absolute independence of every sovereign authority, and of the international comity which induces every sovereign state to respect the independence and dignity of every other sovereign state, each and every one declines to exercise by means of its courts any of its territorial jurisdiction over the person of any sovereign or ambassador of any other state, or over the public property of any state which is destined to public use, or over the property of any ambassador, though such sovereign, ambassador, or property be within its territory; and, therefore, but for the common agreement, subject to its jurisdiction."

And in the concluding portion of his opinion he said: "If the remedy sought by an action in rem against public property is, as we think it is, an indirect mode of exercising the authority of the court against the owner of the property, then the attempt to exercise such an authority is an attempt inconsistent with the independence and equality of the state which is represented by such owner."

In The Porto Alexandre, [1920] L. R. Prob. 30, the Court of Appeal had before it the question whether a vessel owned or requisitioned by a sovereign independent state and earning freight for the state was thereby deprived of its right to claim immunity, because she was employed in ordinary trading voyages carrying cargoes for private individuals. The court below granted the im-

munity, although the judge stated that it was with the greatest reluctance, as the vessel was being used in ordinary commerce. In his view the law as laid down in The Parlement Belge, supra, was that a sovereign state could not be impleaded, either by being served in personam or indirectly by proceedings against its property; and if that were the principle, he added, "it mattered not how the property was being employed." The Court of Appeal unanimously affirmed his decision, each of the judges writing a concurring opinion. In the course of his opinion in the above case, Warrington, L. J., in commenting approvingly on the decision of the Massachusetts court in Briggs v. Light Boats, supra, said:

"There is one passage in the judgment of Judge Brett, L. J., in The Parlement Belge, 5 P. D. 213, in which he is expressing what he considers to be the result of the judgment in Briggs v. Light Boats, 93 Mass. 157, an American case, of which he obviously approves and on which he founds his own conclusion. He says: 'The ground of that judgment is that the public property of a government, in use for public purposes, is beyond the jurisdiction of the courts of either its own or any other state, and that ships of war are beyond such jurisdiction, not because they are ships of war, but because they are public property. It puts all the movable public property of a state, which is in its possession for public purposes in the same category of immunity from jurisdiction as the person of a sovereign, or of an ambassador, or of ships of war, and exempts it from the jurisdiction of all courts for the same reason, viz. that the exercise of such jurisdiction is inconsistent with the independence of the sovereign authority of the state.'"

In Luther v. James Sagor & Co., [1921] L. R. 3 K. B. 532, the plaintiff claimed title to certain property in England as the original owner of the property in Russia, where the plaintiff had a factory. The plaintiff claimed that in 1919 the Soviet government, without any right or title to do so, seized all the stock at the plaintiff's mill in Russia and then sold it to the defendant. The Soviet government at that time had not been recognized by England, and it was claimed the seizure was a pure robbery. The defendants, an English firm, claimed through purchase from the Russian Commercial Delegation in London, acting in behalf of Soviet Russia. In the court below the plaintiff obtained judgment on the ground that the English government did not recognize the Soviet gov-

ernment as the government of a sovereign state. Pending an appeal England recognized the Soviet government as a de facto state. The appellate court thereupon reversed the lower court. It was held to be all one, so far as the question involved was concerned, whether the foreign government was recognized as a government de jure or de facto. Warrington, L. J., in his opinion stated that, while the acts complained of were committed prior to recognition, the recognition subsequently accorded was to be treated as retroactive. He said that, if the act in question was an act of the state so recognized, "it must in my opinion, be entitled to the same respect as the act of a sovereign state, whether done before or after recognition. We have not been referred to, nor have I found, any authority in the English law on the point, but there are decisions of the Supreme Court of America directly supporting the view I have expressed." In his opinion and in that of Scrutton, L. J., the decisions of the Supreme Court are quoted approvingly.

[4, 5] It is said that the Mexican government, in operating the National Railways of Mexico, is engaged in trade and in a nongovernmental enterprise. This view of the matter we do not accept. It is a fact, of which we take judicial notice, that in the leading countries of Europe, as well as in Canada, it is the practice of governments to own and operate the railways. This is not regarded by them as engaging in trade, but as the performance of a fundamental governmental function. It evidently is so regarded in Mexico, and while in the United States the railways are not owned and operated by either the state or federal governments, we are not justified, on that account, in holding that the Mexican government is engaged in trade, and not performing a governmental function, in operating the National Railways of Mexico.

The plaintiff has urged upon our attention the recent decision of State of Georgia v. City of Chattanooga, 264 U. S. 472, 44 S. Ct. 369, 68 L. Ed. 796. That involved the question whether land acquired and held by the state of Georgia within the borders of Tennessee, with the consent of the latter state, remained subject to the eminent domain power of the state in which the land lay, and was subject to be condemned by that state, or her authorized municipality, for public purposes. The court simply held that the power of eminent domain is an attribute of sovereignty, and inheres in every independent state. It was said that power is

deemed to be essential to the life of the state, and it was added: "It cannot be surrendered, and, if attempted to be contracted away, it may be resumed at will." It was also declared that "land acquired by one state in another state is held subject to the laws of the latter and to all the incidents of private ownership." We are unable to see the application of the principle laid down in that case to the facts of the case now before the court. It fails to establish the proposition, for which the plaintiff contends, that the government of Mexico occupies the same position as does a private corporation when it engaged in the operation of a railway system.

[6] In a reply brief submitted to this court the plaintiff stated: "It does not assert that Mexico operated its railways in the United States." It later filed a "supplemental reply brief," in which it declared that it withdrew the statement above quoted, and gave as its reason for doing so "that, while the facts do not appear in this record, the plaintiff believes that upon the trial of this action the following additional facts, showing that the government of the United States of Mexico is within the ruling of the State of Georgia Case, will be proved." But plainly the additional facts not in the record, but which the plaintiff thinks it can prove if the case goes to trial, and which it does not even allege to be true, we manifestly must disregard.

The question whether a vessel owned or requisitioned by a foreign government and engaged in trade, and which is within the United States, is subject to the jurisdiction of our courts has not been decided. The matter was referred to in Ex parte Muir, 254 U. S. 522, 531, 41 S. Ct. 185, 187, 65 L. Ed. 383 (1921), where it was said to be "one of obvious delicacy and importance. No decision by this court up to this time can be said to answer it." And again in Ex parte Hussein Lutfi Bey, 256 U. S. 616, 41 S. Ct. 609, 65 L. Ed. 1122 (1921), it was alluded to as "important and also new." The court added that its "proper solution is not plain, but debatable." But the question which is now presented to us is not the question adverted to above, and bears no analogy to it. This record does not disclose that Mexico is operating a railroad in the United States or is here engaged in trade.

The United States of America and the United States of Mexico have entered into a convention which provides for the amicable settlement and adjustment of claims by the citizens of each country against the other.

The convention was concluded and signed at Washington on September 8, 1923. It was ratified by this country on February 4, 1924, and by Mexico on February 16, 1924; and, ratifications having been exchanged by the two governments, it was proclaimed by the President of the United States on March 3, 1924. 43 Stat. pt. 2, p. 110. The treaty provides in article 1 as follows:

"All claims * * * against Mexico of citizens of the United States * * * for losses or damages suffered by persons or by their properties * * * and all claims for losses or damages originating from acts of officials or others acting for either government and resulting in injustice * * * as well as any other such claims which may be filed by either government * * * shall be submitted to a commission."

The claim involved here appears to be a claim for damages arising "from acts of officials or others" acting for the government of Mexico; and an examination of the treaty shows that the government of the United States has agreed that the claims of its citizens against the government of Mexico are to be decided by a commission created for the purpose of adjudicating such claims; and article 8 makes the decision of the commission final and conclusive. Treaties are made by the Constitution of each country the supreme law of the land. Nevertheless the plaintiff in error contends that the treaty cannot divest the courts of their constitutional jurisdiction, and it also contends that there is nothing in the treaty which indicates an intent to deprive one of his right to resort to the courts. This is to assume that the plaintiff has a cause of action which, irrespective of the treaty, it has a right to submit to the courts. It is enough to say that we do not agree that it had any such right after the government of the United States recognized the government of Mexico; and the treaty shows that the two governments have not left their citizens remediless respecting such claims as those now before us. In our opinion, the treaty does not deprive the plaintiff of any right or remedy, but it provides a remedy which the courts of the United States do not afford.

We are aware of the importance of the question this case raises. We have had the benefit of a full and able presentation of the case by counsel, and have examined the decided cases with care; and we are not in doubt as to what our decision should be. The District Court, in our opinion, was without jurisdiction, as the property involved was that of the government of Mexico, and was

used by it in the performance of what it considers a governmental function. The property sought to be reached in this country is the public property of Mexico, and is movable property, which that government holds for public purposes, and, being such, it is entitled to the same immunity as a sovereign, or an ambassador, or a ship of war, and for the same reason. The exercise of such jurisdiction by the courts of this country is inconsistent with the independence and sovereignty of Mexico.

The order vacating the attachment and dismissing the suit is affirmed.