### THE KATINGO HADJIPATERA.

District Court, S. D. New York.
March 25, 1941.

Bigham, Englar, Jones & Houston, of New York City (T. Catesby Jones, Henry N. Longley, and John W. R. Zisgen, all of New York City, of counsel), for libellants.

Hatch & Wolfe, of New York City (Carver W. Wolfe, of New York City, of counsel), for Kingdom of Greece.

LEIBELL, District Judge.

Statement dictated on the record at the termination of the hearings.

I had read your briefs, of course, before we took any testimony yesterday, and we had a discussion of the various cases cited in chambers before the hearing here yesterday was set, and we sat here last night from about seven o'clock until nine o'clock taking the testimony of two witnesses who were offered in support of the suggestion of immunity. One of them was Captain Courbellis, who is a Greek official attached to the Greek Ministry of Shipping and attached to the Royal Greek Legation to look after and superintend the Greek steamers in the United States and Canada. The other was Captain Skinitis, who was the master of the Greek Steamship Katingo Hadjipatera, which has been libeled in this action.

As I stated before the testimony of these two witnesses was taken, it appeared to me that the representation of the Greek Minister to the Secretary of State of the United States to the effect that this steamer Katingo Hadjipatera, owned by Greek nationals, had been requisitioned by the Greek Government on or about February 21, 1941, was proof of that fact, in view of the filing here in this court in this action by

the United States Attorney, acting for the Attorney General and at the request of the Secretary of State of the United States, of a suggestion of immunity which embodied the statement of the Greek Minister as above indicated.

In addition, the testimony of Captain Courbellis shows that he received a cablegram from the Greek Minister in London to the effect that this vessel and another vessel had been ordered requisitioned by the Greek Government. These two vessels mentioned in that cable were, according to the testimony of the captain, two of a group of twelve or fourteen vessels which had been similarly requisitioned by the Greek Government, so that I am satisfied with the evidence on that point, and I find that the Steamship Katingo Hadjipatera which has been libeled in this action was requisitioned by the Greek Government on or about February 21, 1941.

I further find that a notice of the requisitioning of the vessel by the Greek Government was sent by mail, February 25, 1941, by Captain Courbellis, to the master of the vessel Katingo Hadjipatera care of a firm at Newport News who were the agents for the steamer.

I further find that notice from Captain Courbellis was delivered to Captain Skinitis, and the notice is exhibit 1 in this proceeding. A translation of the notice is exhibit 1-A.

On February 26, at about 3:15, Captain Courbellis was telephoned by Captain Skinitis and in that telephone conversation Captain Skinitis acknowledged the receipt of that notice of the requisitioning of his vessel and stated, in effect, that he would abide by it.

According to the testimony of Captain Courbellis and according to the admission of counsel for the Greek Government in this proceeding, the title to the vessel was not requisitioned by the Greek Government. According to the testimony of Captain Courbellis, and I so find, the possession and use only of the vessel was requisitioned by the Greek Government, and that possession and use was to be given to the Greek Government pursuant to such requisition after the delivery of the cargo which the vessel Katingo Hadjipatera had aboard at the time it was requisitioned.

I find that the vessel Katingo Hadjipatera had aboard a varied cargo, mostly tobacco; that on the voyage across the South Atlantic a fire had developed in one hold of the steamer; that after the vessel arrived at Newport News smoke was seen coming from at least one of the holds and further steps had to be taken to put out the fire in one of the holds of the vessel. Part of the cargo had been discharged at Newport News, part at Norfolk, and then the vessel sailed from Norfolk for New York about midnight March 5, 1941. The vessel arrived at the Port of New York on March 7, 1941, and docked at 12:35 p. m. on that date.

The libel in this case was filed on the same date, and the marshal took possession of the vessel under the libel and also under a certain writ of attachment issued by this court on that same day. At the time the vessel was thus libeled and attached, it still had undelivered cargo in the hold, cargo that had been transported from ports in the Near East in this vessel across the South Atlantic and then up to Newport News and Norfolk and then on to New York.

Exhibit 1, the notice of the requisition of the vessel, which the master received on February 26 and which bears date February 25, 1941, was signed by Captain Courbellis, and reads as follows:

"To the Captain of the SS Katingo Hadjipatera, % T. Parker Host, % Terminal Building, Newport News, Virginia.

"Following a cabled order of the Greek Legation in London dated February 22, 1941, your boat has been requisitioned to transport cargo belonging to the Greek Government to Piraeus. As soon as you have unloaded your present cargo sail to the Port of New York to take on this new shipment. Agents for this shipment are the Greek Line, 10 Bridge Street, New York City. Kindly acknowledge receipt of this letter."

The vessel Katingo Hadjipatera was still unloading cargo at the Port of New York on March 12, 1941, when a further notice was addressed to and served upon the captain of the vessel. That notice is Exhibit 2 and reads as follows:

"To the Captain of the SS Katingo Hadjipatera. Following cabled order No. 1539 1941 of Royal Greek Legation in London, you are ordered to proceed to Chile for loading of nitrates designated for Greece."

At the time the vessel arrived at Newport News it was assisted by the agent for the owners of the steamship, the two individual respondents herein, and whatever

papers were necessary were filed by them in the master's behalf with the Customs officials at both Newport News and Norfolk, Virginia. Likewise bunker facilities were afforded to the vessel at Norfolk and certain payments on account of expenses of these accommodations were made by the captain from the ship's moneys. No endorsement was made either upon the manifest or the register or any other documents of the ship to indicate that there had been any transfer or change of title to the vessel. The same is true of the papers that were filed in the Custom House at New York. The pier to which the vessel proceeded in New York, at the foot of Columbia Street, Brooklyn, was the pier of Garcia & Diaz, who were the agents for the Hellenic Line, who were the charterers of this vessel on the voyage from the Near East to these various ports in the United States, Newport News, Norfolk, and New York, and a further port at which part of the westbound cargo was to be delivered, namely, Camden, New Jersey.

Captain Courbellis did not physically take possession of this vessel for the Greek Government. I find that there was no physical possession of the vessel taken under the requisition for the Greek Government at any time prior to the filing of the libel by the libellants herein on March 7, 1941, and the seizure of the ship under the libel and under the writ of attachment.

The captain of the vessel did not, on behalf of the Greek Consul or the Greek Government, take possession of the vessel for the Greek Government prior to the filing of the libel herein and the taking possession of the vessel by the United States Marshal for the Southern District of New York under the libel and pursuant to the writ of attachment.

I find that it was the intention and purpose of Captain Courbellis and it was the understanding of Captain Skinitis that possession of the vessel for the Greek Government was not to be taken and that Captain Skinitis was not to follow the orders of Captain Courbellis in respect to the vessel and its operation until after the westbound cargo of the vessel had been fully discharged.

### Conclusions of Law.

I have therefore reached the following conclusions of law:

1. That the suggestion of immunity should be overruled and that the motion made on behalf of the Greek Government based upon such suggestion of immunity and asking that the libel herein be dismissed and that the vessel be delivered to the Greek Government or its agent should be denied.

I have read the various opinions in the case of The Navemar, reported in 303 U.S. 68, 58 S.Ct. 432, 82 L.Ed. 667, and also in, 2 Cir., 102 F.2d 444; also the decision of the United States Supreme Court in the case of The Pesaro, 271 U.S. 562, 46 S.Ct. 611, 70 L.Ed. 1088; The Exchange v. M'Faddon, 7 Cranch 116, 3 L.Ed. 287; Ex parte Muir, 254 U.S. 522, 41 S.Ct. 185, 65 L.Ed. 383; Ex parte New York, 256 U.S. 503, 41 S.Ct. 592, 65 L.Ed. 1063, and The Davis, 10 Wall. 15, 19 L.Ed. 875.

These appear to be the leading cases on the points involved in this proceeding, and I feel that they sustain the conclusions of law arrived at by the Court.