Petition of PETROL SHIPPING CORPO-
RATION, Petitioner-Appellant,

v.

The KINGDOM OF GREECE, MINISTRY
OF COMMERCE, PURCHASE DI-
RECTORATE, Appellee.

No. 119, Docket 28188.

United States Court of Appeals
Second Circuit.

Argued Oct. 30, 1963.

Decided Jan. 7, 1964.

. Clark, Circuit Judge, dissented.

Hill, Betts, Yamaoka, Freehill & Long-
cope, New York City, for appellant, Eu-
gene F. Gilligan and Eli Ellis, New York
City, of counsel.

Arthur M. Becker, Washington, D. C.
and New York, N. Y., for respondent, ap-
pearing specially. Becker & Greenwald,
Washington, D. C., of counsel.

Before SWAN, CLARK and MAR-
SHALL, Circuit Judges.

PER CURIAM.

Respondent chartered the petitioner's
tanker *Atlantis* to carry grain from Tex-
as to Greece.[1] At Piraeus, Greece, the
Respondent designated a berth at which
the *Atlantis* could not safely lie afloat
and sustained damage for which the Re-
spondent disclaimed responsibility. The
charter party contained an arbitration
clause. Petitioner appointed an arbitra-
tor and, in reliance on § 4 of the Ar-
bitration Act, 9 U.S.C.A., moved in the
court below for an order directing Re-
spondent to appoint one.[2] The Greek
Ambassador to the United States, ap-
pearing specially, suggested want of
jurisdiction to sue a sovereign state with-
out its consent. Judge Dawson so held.
The petitioner has appealed. It con-
tends that the court erred in accept-
ing the unsupported suggestion of the
Greek Ambassador and should have re-
quired the Respondent to establish its
right to immunity through channels of
our State Department.

The narrow issue presented by the ap-
peal is one which was settled for this
court in Puente v. Spanish National
State, 2 Cir., 116 F.2d 43, cert. den. 314
U.S. 627, 62 S.Ct. 57, 86 L.Ed. 504.

1. The grain was purchased under an
agreement between the United States
and Greece made pursuant to the Agri-
cultural Trade Development and Assist-
ance Act, 7 U.S.C.A. § 1691 et seq.

2. It should be noted that the arbitration
clause provided that "for the purpose of
enforcing any award, this agreement may
be made a rule of the Court." Petition-
er's suit sought an order directing ap-
pointment of an arbitrator, not an order
*enforcing an award.*

There the plaintiff sued for legal fees. No appearance was entered for defendant, but the Spanish Ambassador to the United States submitted to the Clerk of the District Court a letter which stated "that under prevailing principles of international law the Spanish Government as a Sovereign State is not subject to suit in your Court without its consent, which in this case it declines to accord." In a well-reasoned and lucid opinion (in which Judge L. Hand and Judge Chase concurred) Judge Clark stated that the question for decision is "how the conceded immunity of a friendly foreign state from suit without its consent is to be presented to a court." The Ambassador's letter was held sufficient. The opinion points out the distinction between cases where this is true and those where a foreign sovereign lays claim to a vessel over which the District Court has already acquired jurisdiction. In the latter type of case, of which Ex parte Muir, 254 U.S. 522, 41 S.Ct. 185, 65 L.Ed. 383, is an illustration, the foreign sovereign must establish through channels of our State Department its right to immunity. The Supreme Court has never, so far as we are advised, limited in any way the Puente decision.

The judgment is affirmed.

CLARK, Circuit Judge (dissenting):

In Puente v. Spanish Nat. State, 2 Cir., 116 F.2d 43, 45, cert. denied 314 U.S. 627, 62 S.Ct. 57, 86 L.Ed. 504, a case where, as we said, "there is no vestige of apparent jurisdiction," we stated this important limitation on the defense of sovereign immunity: "When a court appears to have all the elements of jurisdiction of an action, it is not improper to require of even a sovereign who would oust it of that jurisdiction that he furnish due proof to support his claim."[1] While our illustrative examples naturally

concerned cases we had had, to wit, foreign vessels within the district court's jurisdiction, we expressly declined to limit the rule to particular instances, and indeed in contemporary cases we recognized the controlling importance of State Department pronouncements as to immunity claims. See, e. g., Sullivan v. State of Sao Paulo, 2 Cir., 122 F.2d 355; United States ex rel. D'Esquiva v. Uhl, 2 Cir., 137 F.2d 903, 906–907; see also Republic of Mexico v. Hoffman, 324 U.S. 30, 38, 65 S.Ct. 530, 534, 89 L.Ed. 729: "We can only conclude that it is the national policy not to extend the immunity in the manner now suggested, and that it is the duty of the courts, in a matter so intimately associated with our foreign policy and which may profoundly affect it, not to enlarge an immunity to an extent which the government, although often asked, has not seen fit to recognize."

But it is most important to note that in later authorities not mentioned below or here, the law to which these cases pointed has been explicitly stated and the defense of sovereign immunity definitely restricted in cases involving the commercial activities of a foreign state.[2] In the now well known and important "Tate letter" of May 19, 1952, on behalf of the Secretary of State to the Attorney General, by Professor Jack B. Tate, then Acting Legal Adviser to the Secretary, the Department expressly clarified its position and in a reasoned exposition citing precedents set forth its future policy "to follow the restrictive theory of sovereign immunity"—applicable to a sovereign engaged "in commercial activities"—and to limit the claim of immunity accordingly. 26 Dept. State Bull. 984 (1952). This was followed in National City Bank of New York v. Republic of China, 348 U.S. 356, 361, 75 S.Ct. 423, 427, 99 L.Ed. 389, in saying that "[r]ecently the State Department has pronounced broadly

---

1. The Puente case—unlike the Sullivan case—has never been cited in the Supreme Court and very rarely (almost never in recent years) in lower federal courts, undoubtedly because the later events recounted in the text showed it a

less extensive precedent than as here cited.
2. For discussion of this trend see, e. g., Timberg, Expropriation Measures and State Trading, 1961 Proc.Am.Soc.Int.L. 113, 118.

against recognizing sovereign immunity for the commercial operations of a foreign government," with citation to the Tate letter. And since that time (1952) it appears to have been common practice to seek or await State Department advice before a grant of this and other forms of immunity is made. Among illustrative cases we may cite Bernstein v. N. V. Nederlandsche-Amerikaansche Stoomvaart-Maatschappij, 2 Cir., 210 F.2d 375, where we reversed a previous ruling when informed of a State Department release to the contrary; and Banco Nacional de Cuba v. Sabbatino, 2 Cir., 307 F.2d 845, 855–858, cert. granted 372 U.S. 905, 83 S.Ct. 717, 9 L.Ed.2d 715, containing a full discussion, with extensive citations, of the role of the State Department in civil litigation in the federal courts. See also Rich v. Naviera Vacuba, S. A., 4 Cir., 295 F.2d 24.

Here the district court, in granting immunity, without any advice whatever from the State Department, in a case involving a grain sale to, and an agreement to arbitrate by, the Kingdom of Greece, thus accorded that Kingdom a special privilege, contrary to the principles stated above. Before taking such a course the district judge should have asked the respondent to advise him as to the State Department's position with reference to its claim of immunity or should himself have directed an inquiry to the Secretary of State. There was particular reason to do so here, as this concerned not the enforcement of a final decree, but merely the preliminary step of requiring the respondent to appoint an arbitrator, as it had agreed in its contract to do. See for such an order against a foreign corporation under similar circumstances, Farr & Co. v. Cia. Intercontinental De Navegacion De Cuba, S. A., 2 Cir., 243 F.2d 342. The circumstances of consent to the arbitration of what appears clearly to be a commercial transaction suggest a good possibility that the Department which has the responsibility (as we do not) for control of our foreign relations will not support the defense of immunity here. As it stands, the district court has assumed to interfere most discriminatorily in delicate foreign relations not entrusted to its responsibility, and a majority of the court now supports the interference. Had this ever been the law and common practice, it is surely not so now. I would reverse and remand for ascertainment of the State Department's position as to this immunity claim.