THE JAMES McCAULLEY. THE MARIE PALMER. THE BLANCHE HOPKINS.

(Circuit Court of Appeals, Third Circuit. September 28, 1910.)

No. 1,345.

1. COLLISION (§ 66*)—SCHOONER AND TUG AND TOW MEETING—FAULT OF TUG.

The finding of the District Court that a tug with a schooner in tow on a hawser was solely in fault for a collision between her tow and a meeting schooner in Delaware Bay at night, on the ground that she held her course directly toward the meeting schooner until they were

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

so close that there was danger of collision, and then attempted to cross the schooner's bow with her tow, affirmed.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 84; Dec. Dig. § 66.*]

2. ADMIRALTY (§ 92*)—SUIT IN REM—LIMITATION OF RECOVERY BY STIPULATION FOR RELEASE OF VESSEL.

Where a vessel libeled in a suit in rem is released on a stipulation for value, the court is without jurisdiction to enter a decree against the stipulators for a greater sum than that named in the stipulation.

[Ed. Note.—For other cases, see Admirality, Cent. Dig. §§ 646–649; Dec. Dig. § 92.*]

Archbald, District Judge, dissenting

Appeal from the District Court of the United States for the Eastern District of Pennsylvania.

Suits in admiralty for collision by the schooner Marie Palmer against the Blanche Hopkins and the tug James McCaulley, and by the Hopkins against the McCaulley and the Palmer. Decree against the McCaulley in each case, and claimant appeals. Modified and affirmed.

For opinions below, see 155 Fed. 894, and 173 Fed. 569.

John F. Lewis and F. C. Adler, for appellant.
Howard M. Long, for appellee Marie Palmer.
Henry R. Edmunds, for appellee Blanche Hopkins.

Before LANNING, Circuit Judge, and BRADFORD and ARCHBALD, District Judges.

LANNING, Circuit Judge. This case grows out of a collision of the two schooners Marie Palmer and Blanche Hopkins in Delaware Bay shortly after 3 o'clock on the morning of October 30, 1903. Both of the schooners were seriously damaged. The Palmer, towed by the tug James McCaulley, was passing down the bay and the Hopkins was coming up. There were two proceedings in the District Court, one on the libel of the master of the Palmer against the McCaulley and the Hopkins, and the other on the libel of the master of the Hopkins against the McCaulley, whose owner brought in, under the fifty-ninth admiralty rule, the Palmer. In these two proceedings the District Court held the McCaulley to have been solely at fault. See opinion, 155 Fed. 894. After a reference to a commissioner and the confirmation of his report, a decree was entered in each of the proceedings against the McCaulley in accordance with the opinion of the District Court in 173 Fed. 569. The two proceedings have been consolidated for the purposes of the present appeal. The master, mate, engineer, and steward of the McCaulley, the master, lookout, helmsman, and one of the crew of the Hopkins, and the master, second mate, and helmsman of the Palmer, were the witnesses in the two proceedings. Their testimony is conflicting. There would be little profit in discussing it in detail. We have read it with care, and are perfectly satisfied with the conclusion of the District Court that the Palmer was wholly free from fault. The real question in the case is whether the collision was due to the negligence of the McCaulley only, or to that of the Hopkins only, or to the joint negligence of the McCaulley and the Hopkins.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The substance of the testimony of the four witnesses for the Hopkins is that 8 or 10 minutes before the collision the red and green side lights of the tug McCaulley were seen about one point off the Hopkins' port bow; that, when near the Hopkins, the McCaulley crossed the bow of the Hopkins and barely escaped a collision; that the Hopkins, then discovering the Palmer about four points off the Hopkins' port bow, put her wheel hard up for the purpose of crossing and cutting the hawser running from the McCaulley to the Palmer, and thereby avoiding, if possible, collision with the Palmer; and that the Hopkins succeeded in cutting the hawser, but that the Palmer struck the Hopkins near the latter's stern.

The substance of the testimony of the witnesses for the McCaulley and the Palmer is that the Hopkins first showed to them her lights from one-fourth of one point to one point off their starboard bows; that a little later the Hopkins changed her course across the bows of the McCaulley and the Palmer; that the tug McCaulley then gave two blasts indicating her intention of passing the Hopkins starboard to starboard, and starboarded her wheel for that purpose; that, as the Hopkins continued her course across the McCaulley's bow, the McCaulley blew four blasts as a signal of danger and hard-starboarded her wheel; and that, although the McCaulley escaped, the two schooners collided.

It appears, also, that the McCaulley was on the easterly side of the channel, which was at least a mile wide. She should have been on the westerly side. The Hopkins was about in the midchannel, or possibly a little on the easterly side. The Palmer had no choice as she was the tug's tow. Whichever of the two conflicting stories is adopted, it is clear that the tug McCaulley attempted to cross the Hopkins' bow. Her own master says that if he had been at the wheel, and had seen the Hopkins' lights, he would not have attempted to cross the Hopkins' bow. Other witnesses say that if the tug had steered to the west instead of the east—that is, toward the port side of the Hopkins and the proper side of the channel—there would have been no collision.

There is no suggestion by any of the witnesses that the tug at any time changed her course toward the west. All the witnesses who testify on the subject say that her changes were toward the east. If, then, we accept as true the statements of the witnesses for the Hopkins that, when the lights of the tug were first seen from the Hopkins, they were on the Hopkins' port bow, and that the Hopkins did not change her course, the changes in the course of the tug took her and her tow across the Hopkins' bow, and the Hopkins is without fault. If, on the other hand, we accept as true the statements of the witnesses for the tug and the Palmer that, when the Hopkins' lights were first seen, they were off the starboard bows of the tug and the Palmer, and the tug's changes were toward the east, there could have been no collision unless the Hopkins had changed her course also toward the east. Of the four witnesses for the tug the mate is the only one who testifies that the Hopkins altered her course. Of the three witnesses for the Palmer two testify that the Hopkins altered her course. Of the four witnesses for the Hopkins the lookout says he could not tell whether the Hopkins altered her course as he was on

the lookout. The man at the wheel admits that the course of the Hopkins was changed one-fourth of a point toward the east, but we think his testimony is to the effect that the change was made before the lookout reported the lights of the tug. The master declares that no change in the course was made from the time of the lookout's report until after the tug had crossed the Hopkins' bow and blown her danger signals. The fourth witness, a member of the crew, is silent on the question of change in the course of the Hopkins.

Whether all the vessels were on the easterly side of the channel or not, we are satisfied that location was not the proximate cause of the collision. The Hopkins was a sailing vessel, and, as against the tug, was entitled to hold her course. The vessels were approaching each other at the time when their lights were first seen, nearly head on. The duty of the tug was to steer clear of the Hopkins. The District Court regarded it as incredible that the Hopkins, a sailing vessel, changed her course to the east, and attempted to cross the bow of the tug. We should not reverse the finding of that court except on a clear preponderance of evidence against the Hopkins. No reason for changing her course to the east is shown or suggested. All four of her witnesses expressly declare that, when the tug's lights were first seen by them, the tug was about one point off the Hopkins' port bow. If that be so, then, since the tug was concededly on the easterly side of the channel, the Hopkins was still further on that side, which was her proper side. Only the mate of the tug and the master and second mate of the Palmer claim to have seen the lights of the Hopkins when they were first discernible. After a careful consideration of all the evidence, we have concluded that there is not such a preponderance of proof of negligence on the part of the Hopkins as to warrant a reversal of the decree of the District Court.

The decree of the District Court in the proceeding instituted by the libel of the master of the Palmer against the tug McCaulley and the schooner Hopkins is divided into two parts, and declares:

(1) That the master of the Palmer recover from the claimant of the tug McCaulley and his stipulator the aggregate sum of $2,161.95 for damages to the Palmer and for interest, and also the sum of $398.-13 for costs, making a total sum of $2,560.08.

(2) That the libel of the master of the Palmer be dismissed as to the schooner Hopkins, and that the master of the Hopkins recover from the master of the Palmer and his stipulator costs amounting to $284.20.

The decree in the proceeding instituted by the libel of the master of the Hopkins against the tug McCaulley and the schooner Palmer is also divided into two parts, and declares:

(1) That the master of the Hopkins recover from the claimant of the tug McCaulley and his stipulator for damages to the Hopkins, with interest, the aggregate sum of $7,326.08, and also for costs the sum of $660.70, making a total sum of $7,986.78.

(2) That the petition of the claimant of the tug McCaulley, filed under the fifty-ninth admiralty rule for the purpose of bringing in the schooner Palmer, be dismissed, and that the master of the Palmer

recover from the master of the tug McCaulley and his stipulator costs amounting to the sum of $72.75.

On November 4, 1903, a stipulation was entered into by the proctors of the Palmer and the Hopkins and their respective owners, setting forth the filing of libels by the master of the Palmer and the master of the Hopkins, and agreeing that the tug McCaulley might be released from attachment in each of the two cases upon a stipulation being given by the claimants of the tug, with sufficient surety, in the sum of $10,000, the agreed value of the tug. It was further agreed that:

"Said stipulation shall be for the benefit of the libelant in both of the above causes should anything hereafter be found to be due from the said tug 'James McCaulley,' in proportion to their respective claims."

Pursuant to the above-mentioned stipulation, James McCaulley, claimant of the tug James McCaulley, and Bonaparte Shoe, his stipulator, on November 5, 1903, entered into a bond acknowledging themselves to be jointly and severally indebted to the master of the Palmer and the master of the Hopkins in proportion to the amounts that might thereafter be adjudged to be due to the libelants, respectively, and, in accordance with the terms of the above mentioned stipulation, in the sum of $10,000, and on the same day the court entered an order releasing the tug James McCaulley from attachment. It will be observed that the aggregate amount of the decrees against the tug McCaulley exceeds the sum of $10,000. In one of the assignments of error this is complained of, and, under the authorities, the assignment must be sustained. In The Ann Caroline, 2 Wall. 538, 548, 17 L. Ed. 833, it was decided that a stipulation for the value of a vessel in an admiralty proceeding stands in the place of the vessel, and that the decree, as against the stipulators, cannot exceed the amount of the stipulation. "Whenever the obligation of the stipulator," said the court, "is for a definite sum named in the stipulation, the surety stipulating to pay that sum cannot be compelled to pay more than that amount. Same rule prevails whether the instrument is in form a bond or stipulation."

In The Steamer Webb, 14 Wall. 406, 418, 20 L. Ed. 774, the court said:

"The libel was in rem against the steamer, and the decree cannot be for more than is within the jurisdiction of the court. The steamer was discharged from arrest on stipulation in the sum of $18,000 for value and $250 for costs. The stipulators, to the extent of their stipulation, have been substituted for the steamer, and thus nothing but the $18,000 value and $250 for costs is within the control of the court. To that extent, and no greater, the stipulators have subjected themselves to the judgment of the court, and they cannot be made liable as stipulators beyond it. It was so determined in the case of The Ann Caroline, and we need not repeat what was then said. The decree in this case was largely in excess of the stipulation, and, while it is affirmed upon its merits, it must be modified in regard to the amount of damages recoverable from the stipulators. The decree of the Circuit Court is affirmed with the modification that it be reduced to the sum of $18,000 damages and $250 costs. And it is further ordered that each party pay his own costs in this court."

The record of the present case fails to disclose whether any bond for costs was given in the court below. It does appear that the court ordered an appeal bond to be given in the sum of $750. The order of this court will therefore be that the portion of the decree of the court

below entered in the proceeding instituted by the libel of the master of the schooner Marie Palmer for the aggregate sum of $2,560.08 for damages and interest, and the portion of the decree of the court below entered in the proceeding instituted by the libel of the master of the Blanche Hopkins for the aggregate sum of $7,986.78, be proportionately reduced so that these parts of the two decrees will equal the sum of $10,000. As thus modified, each of the decrees will be affirmed. The master of the Palmer and the master of the Hopkins are each entitled to recover against the claimant of the tug James McCaulley and his surety their costs on the appeal bond given by the claimant of the tug.

ARCHBALD, District Judge (dissenting). If the decree against the tug is to stand at all, I agree that it should be modified in the way proposed, but it is clear to my mind that the collision occurred solely because of the negligence of the Hopkins, and that the libels against the tug should therefore be dismissed. As seen from the Palmer, when the Hopkins was first observed some two miles off, she showed her green light and bore about a quarter of a point on the Palmer's starboard bow, proving that she was to the west of the tug and tow, pursuing a diverging course, and had she continued so to do, the accident would not have taken place. On sighting the Hopkins and noting her course, the tug, at the same time, as a precautionary and perfectly legitimate measure, veered slightly to the east, which would have increased the divergence, if followed by the Palmer, or even without that, and this would have given all parties plenty of room to pass. But the Hopkins, instead of continuing her course, as she was bound to do,, when about a quarter of a mile off turned admittedly a quarter of a point to the east and probably more, shutting out her green light, and showing her red, and bringing her across the course of the tug. By that time, and as the result of this maneuvre, the vessels were so close in together that the tug, in order to escape being run down, had to veer sharply still further to the east, the Hopkins, as an emergency move, turning also again in the same direction to try and cross over between the tug and her tow, hoping to cut the hawser, but being struck by the Palmer before she could get by. If she had not, by her own errors, brought about the peril where this last move became necessary, it might have been justified. But the peril being of her own making by her previous change, of course, she is not to be let go upon any such plea. It is not to be conceived that the tug, after sighting the Hopkins, a mile or more away, would deliberately change over in the direction that she was coming in the attempt to carry her tow across the Hopkins' bow. Nor, on the other hand, is the Hopkins to be charged with similar foolhardiness, except as it clearly appears from the evidence that she had not observed the tug and tow as she should, when the change to the east was made. According to Nelsen, the man at the wheel of the Hopkins, they had not seen the lights of the tug, although she was almost upon them when this was done, which accounts for it all. "Q. What order did you get from your captain when you made that change of a quarter of a point? What were his words? A. Steer northwest by north, three-quarters north. Q. How had you steered before that?

You were steering by the compass? A. Northwest by north, one-half north. Q. You had not seen anything yourself of the tug's lights, when the change was made, or had you? A. No, sir. We seen her afterwards, about a point on the port bow—on the weather bow. Q. What lights of the boat did you see? A. Red light and green light; also the masthead lights. Q. How far away do you think that the tug was when you first saw her lights? A. She wasn't a very long distance. Shortly after we sighted her, the collision occurred."

It is true that, on being asked to fix the distance, he says it was between a mile and three-quarters of a mile, but it is clear from the other evidence in the case, if not from his own, that it was much less. Harvey, the captain, also says that the lookout reported the lights of the tug about seven or eight minutes before the collision, and that they had been steering their changed course before they made the lights; also, that the tug was not a length or two away when she (the tug) shifted her course and went across their bow, which could only refer to the second change, when the collision was imminent, by which the tug just escaped being run down. It is manifest from this that the Hopkins had not sighted the approaching tug and tow, although in plain view, and had not noticed, of course, that the tug had veered to the east, as she was bound to do, and that it was because of her failure to make this timely observation that she ventured to change her course, which, under existing conditions, she had no right to do. And the lack of a proper outlook on the Hopkins, to which no doubt all this is due, is emphasized by the fact that the lights on the Palmer were not seen at all until she was bearing down on the Hopkins, four points on her weather bow, the captain springing to the wheel at this juncture, and succeeding in getting his vessel off with a glancing blow. Being convinced from these and other considerations that the situation was of the Hopkins' own making, and that this is established by evidence which we are not entitled to disregard, I cannot reconcile myself to an affirmance of the decree holding the tug liable, and am therefore constrained to dissent.