**MITSUBISHI SHOJI KAISHA, Limited, et al. v. SOCIETE PURFINA MARITIME.**

**THE LAURENT MEEUS.**

No. 10179.

Circuit Court of Appeals, Ninth Circuit.

Dec. 10, 1942.

Writ of Certiorari Denied April 5, 1943.

See 63 S.Ct. 858, 87 L.Ed. ——.

Hunt, Hill & Betts, of New York City, and Arch E. Ekdale, of San Pedro, Cal. (John W. Crandall and Geo. Whitefield Betts, Jr., both of New York City, and Arch E. Ekdale, of San Pedro, Cal., of counsel), for appellant Mitsubishi Shoji Kaisha, Ltd.

Martin J. Weil, of Los Angeles, Cal., for appellant General Petroleum Corporation of Calif.

Bigham, Englar, Jones & Houston and T. Catesby Jones, all of New York City, McCutchen, Olney, Mannon & Greene and Farnham P. Griffiths, all of San Francisco, Cal., and Harold A. Black, of Los

Angeles, Cal., for appellee Societe Purfina.

Before DENMAN, MATHEWS, and STEPHENS, Circuit Judges.

DENMAN, Circuit Judge.

This is an appeal from a decree based upon a libel filed November 18, 1940, and amended March 25, 1941, by Societe Purfina Maritime, a Belgian corporation, hereafter called Purfina, against Mitsubishi Shoji Kaisha, Ltd., a Japanese corporation, hereafter called Mitsubishi, and against the diesel oil cargo owned by General Petroleum Corporation of California, hereafter called General Petroleum, and loaded for Mitsubishi's account on October 2, 1940, on the Belgian tanker Laurent Meeus at San Pedro, California, for unpaid freight claimed to be earned under a charter dated September 21, 1940, executed by Purfina and Mitsubishi for the carriage by the tanker of the oil to Japan. The charter made the cargo as well as Mitsubishi liable for the freight, for which the charter provision is, "2. The freight to be paid in cash in New York less 1% discount on telegraphic advice of signing Bills of Lading and is to be considered earned and *not returnable ship and/or cargo lost or not lost.*"

The cargo was seized under process in rem. General Petroleum appeared as claimant and contested the freight liability of the cargo. Instead of paying the value of the cargo, $64,000, into court, General Petroleum secured its release and possession by filing a stipulation for its value. Royal Indemnity Company, a corporation, hereafter called Royal, was the stipulator. Hartford Accident and Indemnity Company, hereafter called Hartford, was stipulated for costs.

The district court held that the cargo being loaded and the freight moneys due, they were deemed earned and payable by Mitsubishi, though the voyage was frustrated by a series of governmental restraints beginning on October 2, 1940, in a postponement of her departure by the Belgian Ambassador, after her cargo was loaded, and culminating in a seizure of the vessel by the Belgian Government. The district court's decree awarded $92,279.59 freight moneys against Mitsubishi: $64,000 (toward the freight obligation) against Royal and General Petroleum and added interest to the award against the latter

from the day the cargo was released to it and the stipulation given. It awarded costs against Hartford.

Mitsubishi, General Petroleum, Royal and Hartford have appealed, all contending there was no breach of the charter by Mitsubishi's nonpayment of the freight money. If the freight is held due from Mitsubishi, General Petroleum admits the lien on the oil cargo and its liability in personam for the $64,000, but contends that it is not liable for interest on the value of the cargo from the date it secured its possession on release from the freight lien, although it had the value of the oil since that time and prevented Purfina from having it by contesting the freight liability.

A. On June 6, 1940, the vessel's Captain Lippens had been served by the Belgian Consul in Galveston, Texas, with the following document, to which the captain appended his signature and of which he entered its substance in the ship's log:

"Belgian Consul

"Galveston, Texas.

"The Consul of Belgium at Galveston informs the captain of the Motor Tanker Laurent Meeus that his ship is requisitioned by the Director General of Marine, acting in the name of the Minister of Communications and of the Minister of National Defense.

"The requisitioned ship may not be time chartered. Any contemplated voyage must be submitted to the previous approval of the Director General of Marine, through the intermediary of the Consul of the Port where the ship is. A copy of the present order of requisition shall be delivered to the captain who will sign the original for execution.

"Made in triplicate at Galveston, on June 6, 1940.

"For the owners of   The Consul of Belthe ship, The   gium
Captain   Signed Baudoux
Signed Lippens   Seal of Consulate."

Mitsubishi claims that this requisitioning by the Belgian Government constituted a taking over of the vessel for the government's account which makes all the subsequent charters of the tanker free from any effect of a charter clause exempting the owner from the "restraints of princes, rulers and people."

The word "requisitioned" is not one of art. As was said by Lord Justice Pickford

of the British Court of Appeals in The Broadmayne, [1916] P. 64, 114 L.T.R. 891, "There is no particular magic in the word [requisition] itself; it does not connote the same state of things in every particular case." Its various meanings are determinable in a specific instance by other facts. It may mean that the vessel's title is taken, as in a condemnation proceeding,[1] or her exclusive or partial use for the requisitioning government,[2] or merely that her ownership and earnings remain in her owner, but only for such voyages as are permitted or directed by the government with a view to the national interest.[3]

The agreement between Mitsubishi and Purfina provided that the charter for the Japanese voyage was "subject to the approval of the Belgian Government, London." Mitsubishi claims that it knew nothing of the June requisitioning, and it becomes pertinent to determine whether the requisitioning was for anything more than a governmental control over the voyages of the vessel by the owner on its own account.

Mitsubishi's brief concedes that the Belgian Government is not "entitled to the freights in the sense that it earned them as carrier." The only alternative is that Purfina earned the freights for its own account. The brief concedes that its claim that Purfina is estopped to assert the frustration is concerned with what was to happen to the freights *after Purfina has earned them.* The same paragraph as that containing the language last quoted, continues, "What we say is that the Government *has* the July freight [on a prior voyage] *and will get the freight money in suit* if Purfina collects it and, as a sovereign power, can use this money if necessity so requires."

With such admissions, it is apparent that we should sustain the finding of the district court that the requisitioning of the vessel on June 6, 1940, was for no more than the Belgian Government's direction of the use of the vessel for Purfina's account.[4] This would impose no more restraint on Purfina than contained in its agreement with Mitsubishi that the charter was subject to approval by the Belgian Government.

Much evidence was taken upon the conduct of the Belgian officials with respect

---

[1] Cf. Filbin Corp. v. United States, D.C.E.D.S.C.1920, 266 F. 911.

[2] Cf. The Kabalo, 1940, 67 Lloyd's List L. R. 572, 575; The Christina, [1938] A. C. 485, 490, 60 Lloyd's List L. R. 147; The Arantzazu Mendi, [1939] A. C. 256, 263, where in each case the government took actual possession.

[3] As in The Katingo Hadjipatera, D.C. S.D.N.Y.1940, 40 F.Supp. 546, affirmed 2 Cir., 119 F.2d 1022, certiorari denied 313 U.S. 593, 61 S.Ct. 1118, 85 L.Ed. 1547; Ex parte Muir, 1921, 254 U.S. 522, 529, 41 S.Ct. 185, 65 L.Ed. 383; The Attualita, 4 Cir., 238 F. 909, 911. In none of these cases was it proved that the notifying government had taken possession for its exclusive beneficial use, and in all, governmental immunity, claimed as a bar to the proceeding, was denied. Government of Kingdom of Belgium v. The Lubrafol, D.C.E.D.Tex.1941, 43 F.Supp. 403, a Belgian ship requisitioned by the same notice to her captain as here was given the tanker.

[4] "V.
"On June 6, 1940, the said tank vessel Laurent Meeus was at the port of Port Arthur, Texas. On said date, the master of said vessel, Richard O. Lippens, was given a document from the Belgian Consul at Galveston, Texas, stating that the said vessel was requisitioned by the Director General of Merchant Marine of the Belgian Government, acting on behalf of the Belgian Minister of National Defense and the Belgian Minister of Communications. Said document further stated that said vessel might not enter into time charters and that every contemplated voyage must first be approved by the Belgian Government. The Belgian Government did not take possession of said vessel at said time, or at any time prior to November 16, 1940. On that date the Belgian Government effected actual full and complete requisition of said vessel. On that date, and not before, the Belgian Government took physical possession of said vessel under and pursuant to said requisition. Between June 6, 1940, and November 16, 1940, the said Laurent Meeus continued in the ownership and possession of Purfina and was operated and managed by Purfina for Purfina's account. Between said dates the Belgian Government, in accordance with the aforementioned document of June 6, 1940, did not exercise a managerial but did exercise a political control over Purfina and said vessel; that is to say, her owner, Purfina, was not permitted to enter upon time charters and the vessel's trading areas were subject to the approval of the Belgian Government. The managerial control and the operation of said vessel during said period remained with Purfina."

to the use of the vessel between June 6, 1940, and November 16, 1940, when the vessel was taken by that government. It is not inconsistent with, but supports, the finding of the trial court, in which we agree. The concessions of the brief above quoted make it unnecessary to give it detailed consideration. We hold the requisition of June 6, 1940, in no way affects Mitsubishi's liability for the freight.

B. The Belgian Government took possession of the tanker on November 16, 1940, under the following circumstances: The Belgian Consul boarded the vessel and delivered a notice stating in part, "* * * on July 10, 1940, the owners of said vessel having been given a permit to operate the said vessel for their own account, and on July 13, 1940, and September 23, 1940, round trips having been approved to permit the owners to operate the vessel on round trips to Japan, and subsequent to the said permits the need of the vessel for the purposes of State having become apparent, the said permits are hereby cancelled as of the 5th day of November, 1940." The Belgian Consul also served a notice that the Belgian Government was in possession of the vessel and required Captain Lippens to sign a declaration that he was holding the ship for the Belgian Government. A corresponding entry was made by the Belgian Consul on the vessel's Lettre de Mer.

Mitsubishi claims that the Belgian Government had some sort of an interest in the unpaid moneys, making the frustration of the voyage by the Belgian requisition in some way an act of Purfina which estops Purfina from suing for the nonpayment of the freight. This claimed Belgian interest consists of the right to compel Purfina to turn over to that government its net profits of the voyage, to be held by that government as trustee, to Purfina's account, just as it so holds the tanker's net earnings on a prior voyage. Mitsubishi's contention proceeds with the assertion that this trust account of Purfina is subject to a possible future expropriation by the Belgian Government.

It seems clear that since Purfina managed the vessel and earned the freight for its own account and not as agent for the Belgian Government, the trusteeship of the net earnings after Purfina had discharged its obligations to Mitsubishi is not a matter of the latter's concern. The net funds were Purfina's property before delivery to the government with its resultant trust interest.

■ With regard to the possibility that Purfina's trust property at some future time might be appropriated by the Belgian Government, the contention that that government took possession of the vessel before it could sail on its voyage for the purpose of giving a larger profit in the earned freight, and hence a larger amount it might sometime expropriate, seems preposterous. However, if such were the purpose of taking over the vessel, Purfina in no way is shown to have participated in the actions of the government but, as appears from the evidence later considered, was trying its best to perform its charter and make the voyage to Japan which its government frustrated. Purfina is not estopped from claiming the freight by the act of the Belgian Government in taking over the tanker for its own use.

■ C. Mitsubishi offered to take a charter containing the clause exempting the responsibility of the owner for the "restraints of princes, rulers and people." The clause as drawn in the offer contained no exception of the restraint of the Belgian Government. Purfina's acceptance concluded with the words "Owner's representatives authorizes us to accept your offer * * * subject to approval of Belgian Government, London." The approval was procured and the charter executed by both parties. It contained the same restraints of princes clause without an exception of the restraints of the Belgian Government.

Mitsubishi claims that the preliminary agreement for the approval of the charter means that if at any time the Belgian Government should exercise a restraint frustrating the voyage, the charter is to be deemed avoided. Its contention is, in effect, that we shall read into the charter as subsequently drawn such an exception of Belgian restraint to the restraints of princes clause. To us the agreement as so finally drawn is clear—Purfina is not responsible if the voyage is lost by the restraint *thereafter of any* government. The governmental approval was a condition precedent to the entry into such a charter, not an agreement that the Belgian Government, after the performance of the charter began, here by loading the cargo, subsequently would not exercise the powers

which might cause its frustration or that if it did so act the charter was avoided.

Mitsubishi cites Texas Co. v. Hogarth Shipping Co., 256 U.S. 619, 629, 41 S.Ct. 612, 614, 65 L.Ed. 1123, and The Tornado, 108 U.S. 342, 349, 2 S.Ct. 746, 750, 27 L. Ed. 747. In the former, a British vessel, before entry on a chartered voyage from Texas to South Africa, was taken over by its government and it was held that such frustration "before the time for performance" excused the parties from performance. In the latter, a charter, drawn with "reference to a particular ship," was held to impose no liability upon the parties where, before the vessel "commenced to earn freight," she was so injured by fire that she could not sail on the voyage in question. There was no clause in either charter providing that freight shall be deemed earned, vessel or goods lost or not lost. We can see in neither any relevance to the instant case, with its earned freight and restraints of princes clause, and the restraint of the Belgian Government beginning shortly *after* loading and culminating with the taking over of the vessel six weeks later.

We hold that there was no agreement to the effect that the charter party was to be avoided after its performance had proceeded to the loading of the cargo in the event of a restraint from its further performance by the Belgian Government.

■ D. Mitsubishi claims a custom of the Port of San Pedro for tankers to sail immediately when loaded, and that, when the Laurent Meeus was loaded, her engine valves required several days overhauling which prevented her sailing with the customary promptness. This, it claims, was a breach of the charter warranting the refusal to pay the freight.

The custom testified to concerned tankers on fast schedules and what was usually done, and not to such a single Asiatic voyage as here chartered. Assuming, however, that such a custom existed in peace time, and applied to a voyage to Japan with the war conditions prevailing, the charter gave Purfina until October 14, 1940, to load. That she loaded before completing the overhauling of her engines, when she could have waited until the overhauling was completed before giving notice to load, does not constitute a breach of a sailing agreement.

■ Nor can Mitsubishi complain of the form of the bills of lading which misdescribed the parties to the charter, though otherwise identifying it. They were prepared by Mitsubishi's agent, General Petroleum, were not negotiable and were no more than a receipt for the cargo, stating it was loaded in the tanker. Copies were received by Mitsubishi from its agent, General Petroleum, on October 4th, two days after loading, and no suggestion made to Purfina that Mitsubishi's agent had erred in their preparation, until months after the frustration of the voyage. Mitsubishi is estopped to complain of its own error in the form of a mere receipt for the cargo which had been delivered to the tanker, a fact which no one disputes.

E. Mitsubishi claims that the tanker was not seaworthy as to her engine valves and the sufficiency of the crew to perform her agreed voyage when the cargo was loaded and her bills of lading issued, or at times thereafter when she could have sailed and hence it had no liability under the clause providing that the freight "is to be considered earned and not returnable ship and/or cargo lost or not lost," even though the voyage be frustrated by a restraint of government.

Mitsubishi appears to argue that this clause should receive a strict interpretation adverse to the charter with reference to a claimed nonperformance by the charterer of its charter obligations. In its brief (and at the hearing) it stresses an argument of unjust enrichment in the payment of freight moneys under this clause in the agreement, where the expense to the owner for a frustrated voyage is less than it would have been if it had been completed. Here the cost to Purfina was admittedly less, but it included the expense of bringing the chartered vessel to the port of loading, the preparation of the vessel for the voyage, the loading of the cargo, and the expenditures for crew, fuel, etc., and loss of the use of the vessel during the six weeks period of delay from October 2nd to November 16th. The demurrage clause affords an estimate of the agreed daily value of the vessel to her owners of $1,500 per day, or $63,000 for the 42 days.

To describe as unjust enrichment the difference between the expense of the completed voyage and that up to the loss of the vessel before the voyage is consummated, or, as here, until the voyage is frustrated,

is to ignore the established and continuing practice of the maritime world for at least the last one hundred and twenty-five years. In 1815, Lord Ellenborough in De Silvale v. Kendall, 4 M. & S. 37, 42, held of a similar clause: "By the policy of the law of England freight and wages, strictly so called, do not become due until the voyage has been performed. But it is competent to the parties to a charter party to covenant by express stipulations in such manner as to control the general operation of law. The question in this case is whether the parties have not so covenanted by the stipulations of this charter party. If the charter party be silent, the law will demand a performance of the voyage; for no freight can be due until the voyage be completed. But if the parties have chosen to stipulate by express words, or by words not express, but sufficiently intelligible to that end, that a part of the freight (using the word 'freight') should be paid by anticipation, which should not depend upon the performance of the voyage, may they not so stipulate? * * * And there can be no doubt that the payment of freight may by the agreement of the parties be so exempted."

This court, in 1904, in Portland Flouring Mills Co. v. British & F. M. Ins. Co., 9 Cir., 130 F. 860, 863, 864, certiorari denied 195 U.S. 629, 25 S.Ct. 787, 49 L.Ed. 352, citing Lord Ellenborough's statement, supra, held valid such a clause in a bill of lading. The clause read: "The several freight and primages to be considered as earned, steamer or goods lost or not lost at any stage of the entire transit." Appellant shipper of goods at Portland to be carried to Hong Kong was sued for unpaid freight moneys. The vessel was lost before reaching Hong Kong. The bill of lading provided: "Freight to be collected in U. S. gold coin or its equivalent, payable at Hong Kong, China." Appellant contended that since the freight was payable on delivery of the goods at the completion of the voyage and, since the vessel was lost prior thereto, no freight could be deemed earned. We held that, assuming that in the absence of the "steamer or goods lost or not lost" clause the freight was payable at destination and hence there would be no liability on appellant to pay it, the clause made it payable regardless of the failure to carry out the contract of carriage.

For over a quarter of a century the majority, if not all, of the larger steamship companies have had similar clauses in the hundreds of thousands of bills of lading issued for the ocean carriage of merchandise. They are accepted as normal incidents of sea borne commerce and are one of the factors in determining ocean freights. The practice of insuring against all the marine hazards of ship and cargo is universal. The carrier has a lessened insurance factor in his costs of transportation where he is certain of his freight earnings despite a frustration of the voyage. The shipper takes insurance against safe delivery and his policy includes the freight eo nomine or in a corresponding increase in the arrived value of his goods. In charters it is presumably a factor in bargaining between owner and charterer. The charterer may claim a lesser freight charge because the cost of insurance of the freight is borne by him and not by the owner.

■ Since 1904, when we established the rule in this circuit, the meaning of the phrase "steamer or goods lost or not lost" has received succeeding interpretation in our courts. · It is established to mean any frustration of the voyage not caused by the act of the owner, including a frustration by government embargo within the restraints of princes, rulers and people clause, before the bill of lading containing the lost or not lost clause has been executed and when the vessel has not broken ground. International Paper Co. v. The Gracie D. Chambers, 248 U.S. 387, 391, 39 S.Ct. 149, 150, 63 L.Ed. 318.

In that case the bill of lading provided "Restraints of princes and rulers excepted.

"Freight for the said goods to be prepaid in full without discount retained and irrevocably, ship and/or cargo lost or not lost."

The frustration was caused by an embargo placed on the voyage by the Treasury Department. The libelant delivered a shipment of paper to the Gracie D. Chambers before September 19, 1917, for carriage from New York to Bordeaux, France. The embargo was ordered on September 18, at 4:25 p. m., and was effective on the following morning. It was not known to the shipper and the owner until after October 4th, when the bills of lading were issued and the freight paid, the vessel then being at anchor and await-

ing clearance. The shipper sued to recover the amount of the prepaid freight and the Supreme Court held that under the freight to be deemed earned clause it could be retained by the shipowner.

The Gracie D. Chambers decision is one of three companion cases, decided the same day, all arising out of restraints imposed by governments in the first world war. In Allanwilde Corp. v. Vacuum Oil Co., 248 U.S. 377, 385, 39 S.Ct. 147, 63 L.Ed. 312, 3 A.L.R. 15, the restraint came after the vessel had started on her voyage. She met heavy weather, put into New York for repairs, where she was denied clearance to resume her voyage. The shippers sued for a return of prepaid freight. The Supreme Court held that under the lost or not lost clause it was earned on shipment of the goods and denied recovery.

In Standard Varnish Works v. The Bris, 248 U.S. 392, 39 S.Ct. 150, 63 L.Ed. 321, *before the time the goods were shipped* on the Bris at New York for carriage to Gothenburg, Sweden, and bills of lading issued, the United States required an export license as a condition of their carriage. None had then been procured. Freight was paid on receipt of the bills of lading. The export license was refused, the goods discharged and returned to the shipper, who sued to recover the freight money. The Supreme Court held the lost or not lost clause made the money earned by the shipowner and denied recovery, though the governmental restraint existed before loading.

The Malcolm Baxter, Jr., 277 U.S. 323, 48 S.Ct. 516, 517, 72 L.Ed. 901, was another government frustration case arising out of the first world war. There the vessel, at New Orleans, in July, 1917, was in an unseaworthy condition for her voyage to Bordeaux, discoverable with due diligence, but not discovered by the owner when the cargo was loaded, the bills of lading issued, the freight prepaid and the vessel sailed. The bills provided the freight was to be deemed earned on the shipment of the goods and contained the usual clause exempting the vessel from "restraints of princes, rulers, and peoples." Her unseaworthiness caused her to seek refuge at Key West, from which she was towed to Havana for repairs.

While there the United States Export Administrative Board on September 28, 1917, put into effect its prohibition of clearances of sailing vessels for the war zone, and clearance was refused. The vessel sailed to New York, where the shipper libeled her for damage to cargo, nonperformance of her contract of carriage, and for return of the prepaid freight. The Supreme Court held that the freight earned clause prevailed despite the fact the vessel's unseaworthiness was discoverable with the owner's proper diligence. There was no warranty of seaworthiness and the court found the proximate cause of the frustration was the denial of the clearance and not the unseaworthiness.

■■ These cases dispose of what we take to be Mitsubishi's contention that in determining unseaworthiness as to engines or crew, the lost or not lost clause imposes a rule of construction adverse to the Purfina. We are in accord with the finding of the district court that when the cargo was loaded on October 2, 1940, the fact that the vessel's engine valves needed grinding did not constitute unseaworthiness and that, as later discussed, her crew was sufficient on her day of loading.

■ F. Purfina brought itself within the "restraints of princes, rulers and people" clause of the charter by its showing that the tanker's voyage was delayed by continued temporary restraints on the tanker's departure, culminating in the frustrating act of the Belgian Government in taking her over on November 16, 1940. In these circumstances, even where the owner has failed in his duty to make the vessel seaworthy for the voyage, the burden falls upon the shipper or charterer to show that the owner has caused the loss of the voyage. The Malcolm Baxter, Jr., supra, 277 U.S. page 334, 48 S.Ct. 516, 72 L.Ed. 901.

■ We are in agreement with the district court that, as in the case of The Malcom Baxter, the act of the Belgian Government on November 16, 1940, was the proximate cause of the loss of the voyage, and that Mitsubishi has not maintained its burden of proof that the loss of the voyage was caused by Purfina.

On October 2nd, when the cargo was loaded, the tanker's captain had secured certain replacements needed to complete the crew. There was one deck officer and one engineer less than on arrival, but the remaining officers and engineers constituted a proper complement for the vessel. That evening the Belgian Ambassador cabled the captain to postpone sailing until further order. This was followed the next

morning by a notice from the United States Deputy Collector suspending the vessel's departure permit. The adjustment of the ship's valves, a mere routine maintenance job, was completed on October 5th, and the captain notified the engineer to have the tanker ready to leave on two hours' notice.

Undoubtedly the vessel, in a seaworthy condition as to herself and crew, would have begun her voyage on October 5th but for delays imposed by the governments of the United States and Belgium. All that the charter required Purfina to do in the way of management of the vessel had been performed.

This condition of readiness to sail continued to October 18th, seven days after October 11th, when the telegraphic notice of the signing of the bills of lading made the freight payable. These temporary delays of the Belgian and United States Governments continued until October 15th, when the United States granted a sailing permit. On that day the Belgian Ambassador advised that the tanker could proceed on its voyage to Japan but, instead of returning to America, required her, after discharge at Japan, to proceed to Singapore and place the tanker at the disposal of the British authorities. This act of the Belgian Government, preventing the vessel bringing its crew back to the United States, made unenforcible the agreement with the crew for the round voyage. Purfina protested to the Belgian Embassy at London.

On October 18th, the United States revoked its departure permit and on that day most of the crew indicated it would not make a new contract including a voyage to Singapore.

On October 19th the United States Treasury granted a departure permit, but an article appeared in a Los Angeles newspaper referring to reports that the Laurent Meeus might be seized by British warships outside the neutrality limit.

From October 20th to the 22nd the captain was arranging with the Immigration officers for the discharge of his foreign crew. These officials had to have assurances that the men would depart on other vessels within sixty days. On the 22nd the Belgian Ambassador postponed the vessel's sailing date until further instructions, and the next day the United States Treasury suspended its departure permit "until otherwise instructed."

The captain held his crew until the 28th, when eleven deserted. With these successive acts of temporary governmental delay, the captain concluded he had no such certitude of departure as would warrant him in engaging a full crew to stand by for an indefinite period of waiting, with its likely drunkenness and loss of discipline. In this professional judgment he was justified, for, on November 5th, he received a confidential message from the Belgian Ambassador stating the authorization for the voyage was cancelled and advising the transshipment of the cargo. This was followed on November 16th by the taking over of the vessel by the Belgian Government, described above.

We hold that not only has Mitsubishi failed to show that the frustration of the voyage was caused by Purfina, but that the latter has established affirmatively, not only that it did not cause or contribute to the failure of the tanker to leave San Pedro, but that it did all that its charter required with regard to readiness to steam on the voyage and to earn its charter moneys. The decree against Mitsubishi for $92,279.95 and against Royal for $64,000 is affirmed.

G. General Petroleum claims that the district court erred in decreeing interest on the value of the oil which it took from the tanker and of which it immediately had the possession and disposition. Instead of submitting to the libel of Purfina for damages in excess of the value of the oil, General Petroleum entered the proceeding as claimant, answered Purfina's libel, contesting the liability of the res, and thus prevented Purfina from having the sales value of the oil or its cash value until the issue was decided in Purfina's favor in the decree from which it has appealed.

Interest on the amount of damages awarded in admiralty is "further damages." Hemmenway v. Fisher, 20 How. 255, 260, 15 L.Ed. 799. Interest on the stipulated value is such further damages and will not be awarded because the limit of claimant's liability for damages is the amount of the stipulation. The Ann Caroline, 2 Wall. 538, 549, 550, 17 L.Ed. 833. The court there held that the "settled rule is, that where the value of the vessel condemned in a cause of damage is insufficient to pay the loss, it is not competent for the court to award damages against the *owner* beyond the value or proceeds of the ship." (Emphasis supplied).

In that case the decree ordered that "libellants recover against the schooner Ann Caroline *and claimants*" (page 541 of 2 Wall., 17 L.Ed. 833) and provided for execution against the *claimants* unless they appealed. The sum awarded was in excess of the stipulation. The claimants (not the stipulators) appealed and the Supreme Court reduced the recovery to the amount of the stipulation.

Following this decision, the Supreme Court held in The Steamer Webb, 14 Wall. 406, 20 L.Ed. 774, that the stipulation limited the recovery to the release bond given by the claimants themselves. There the claimants appealed as claimants and not as stipulators. The decree for $28,292 was reduced to $18,000, the amount of the bond for the Webb's value, plus $250, the amount of the cost stipulation.

In The Manitoba, 122 U.S. 97, 110, 7 S. Ct. 1158, 30 L.Ed. 1095, the Supreme Court held that the claimants and owners of a vessel released on bond were liable to the extent of the value of the vessel plus interest only from the date of the decree in the trial court and not prior to the entry of that decree.

In the present case, General Petroleum is not a party to the stipulation, but the decree ran against it as claimant, just as it ran against the claimants in The Ann Caroline, supra. In both cases the claimant obtained the immediate possession of the res. In both cases the injured party was prevented from obtaining the immediate beneficial use of the stipulated value of the res by the claimant's answer and defense in the trial proceedings. We feel bound by the holding of the Supreme Court in The Ann Caroline that it is not within our jurisdiction "to award damages against the owner beyond the value," here of the res seized and released to the claimant.

This ruling is in accord with that of the Third Circuit in The James McCaulley, 181 F. 932, 936. This was a collision case in which the Marie Palmer, being towed by the McCaulley, collided with the Blanche Hopkins. Both vessels libeled the McCaulley in rem. The parties agreed that the McCaulley had a value of $10,000 and she was released upon a bond for that amount being deposited in court. The district court held the McCaulley solely at fault for the collision. It held that the Palmer was entitled to $2,560.08 for damages, interest and costs, and that the Hop-

kins was entitled to $7,968.78 for damages, interest and costs, making the total judgment against the McCaulley $10,546.86. The Circuit Court of Appeals, following the decisions in the Steamer Webb and Ann Caroline, supra, modified the decree of the district court and reduced the judgment so that the total liability of the McCaulley, her claimant and her stipulator was $10,000, saying,

"It will be observed that the aggregate amount of the decrees against the tug McCaulley exceeds the sum of $10,000. In one of the assignments of error this is complained of, and, under the authorities, the assignment must be sustained. * * *

"The order of this court will therefore be that the portion of the decree of the court below entered in the proceeding instituted by the libel of the master of the schooner Marie Palmer for the aggregate sum of $2,560.08 for damages and interest, and the portion of the decree of the court below entered in the proceeding instituted by the libel of the master of the Blanche Hopkins for the aggregate sum of $7,986.78, be proportionately reduced so that these parts of the two decrees will equal the sum of $10,000."

Purfina relies on two district court decisions. One, The Southwark, D.C.Pa., 129 F. 171, is overruled by The James McCaulley, supra. In The Southwark the district court erroneously relied on The Wanata, 95 U.S. 600, 34 L.Ed. 461, confusing the interest there allowed from the date of the decree of the district court upon the amount of the stipulation, with interest from the date of the stipulation to that decree, which was not allowed. The decree affirmed by the Supreme Court allowed interest on the principal of the stipulation only from the date of the decree, confining the damages to the stipulated amount.

Purfina's other district court case, The King Bleddyn, D.C.Ala.S.D., 18 F.2d 1000 relies on The Southwark and The Wanata. Neither district court considered The Ann Caroline, The Steamer Webb nor The Manitoba.

We hold that the district court has no power to decree against General Petroleum any greater sum than that of the stipulation it gave for the release of the cargo of oil. The decree of the district court against General Petroleum for $64,000 and interest is modified by striking out the in-

562

terest accrued prior to the date of that decree and awarding interest at 7% per annum on $64,000 from and after that date. As so modified, it is affirmed.

Decree modified and affirmed.