WATERMAN STEAMSHIP CORPORATION, S. E. Foster, as Master of the S.S. JEAN LA FITTE, Despard & Company, Inc., Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 2894.

United States District Court
S. D. Alabama, S. D.

Sept. 14, 1966.

C 1. Under both C 1 and C 2 the cause of action must "arise from" acts enumerated in C 1; no acts are enumerated in C 2.

T. K. Jackson, Jr., of Armbrecht, Jackson, & DeMouy, Mobile, Alabama, for plaintiffs.

Vernol R. Jansen, Jr., U. S. Atty., Mobile, Ala., Harvey M. Katz, Atty., Admiralty and Shipping Section, Dept. of Justice, Washington, D. C., for defendant.

## OPINION

DANIEL HOLCOMBE THOMAS, Chief Judge.

This is an admiralty claim brought by the plaintiff, Waterman Steamship Corporation, to recover from the defendant, United States, certain contributions allegedly due as a result of a General Average Adjustment. In 1959, Waterman's vessel, the SS JEAN LA FITTE, was carrying government cargo under a contract between Waterman and the Military Sea Transportation Service, hereinafter referred to as "MSTS". While en route, the vessel became stranded and losses were sustained in the efforts to refloat the vessel. In accordance with the provisions of the contracts of carriage, a "General Average" situation was declared and put into effect. In a General Average situation, each of the three interests involved (vessel, freight, cargo) are required to contribute their proportionate share of the expenses. Freight, as used in this context means the amount paid or to be paid for the carriage of the cargo. The freight is considered at the risk of the vessel unless there is an agreement to the contrary. Payment for the carriage may be made in advance and considered earned before completion of the voyage, if an agreement to that effect has been reached by the parties; in that event the freight is deemed to be at the risk of the owner of the cargo. Of course, the party whose interest is at risk must bear that interest's proportionate share of contribution in the event of a General Average situation.

In the case at bar, the parties are in dispute over the meaning of the clauses dealing with freight payment in the MSTS contract. The steamship company contends that the 80% payment made upon the sailing of the vessel placed 80% of the freight interest at the risk of the owner of the cargo. The government, as the owner of the cargo, claims that the 80% payment was not an unconditional prepayment but was in the nature of an advancement and therefore all of the freight interest was at the risk of the vessel.

The relevant contractual provisions are set out below:

"Article 4. Payment. (a) At any time after the sailing of the Vessel from the port of loading, the Contractor may submit properly certified invoices or vouchers with respect to each Shipping Order together with a copy of such Shipping Order and shall thereupon *be paid a sum equal to eighty percent (80%) of the compensation* payable under Article 3 for such shipment. *The balance of the compensation* payable for such Shipping Order except as provided in subparagraph (c) below, *shall be paid upon the delivery of the cargo* to the consignee or as otherwise directed by the Government at the port of destination and the submission by the Contractor of properly certified invoices or vouchers with respect to the Shipping Order, such invoices or vouchers to be substantiated by certified copy of the manifest covering the shipment together with a copy of the Shipping Order. * * *

(c) Upon delivery, if there is any shortage or damage not definitely known to be the fault of the Government or its agents, and it is considered by Contracting Officer that withholding of certain monies is necessary to protect the interests of the Government, the dollar amount of such shortage or damage may be estimated and *withheld from sums due,* pending final determination of the amount of shortage or damage and the Contractor's liability therefor." (Emphasis added)

As can be seen from reading the provisions of the contract, there is a com-

plete absence of traditional clauses that resolve all doubt as to whether freight is earned at the time the vessel is loaded. For example and by way of contrast, the Army Space Charter, the instrument which the government used prior to its adoption of the present MSTS contract, contained the following statement:

> "ARTICLE 6. Payment. Full freight * * * shall be considered completely earned when the vessel is loaded * * * ship and/or cargo lost or not lost * * * ".

▓ In its brief, the government took the position that the fact of absence of express and unambiguous terms on the issue of earned freight renders the freight unearned. It is generally correct that prepaid freight is presumed unearned unless there is an agreement to the contrary. The rule is well stated in National Steam Navigation Co. v. International Paper Co., 241 F. 861, 862 (2nd Cir. 1917) where the following appears:

> "The English cases on the subject of prepaid freight do not express the law of this country. Here prepaid freight, in the absence of an agreement to the contrary, must be returned to the shipper, if the goods do not arrive, and in such case the shipowner cannot recover it of the shipper, if not actually prepaid."

In Alcoa S.S. Co. v. United States, 338 U.S. 421, 422, 70 S.Ct. 190, 94 L.Ed. 225 (1949) the principle is restated and the Court recognized that contractual provisions directing that freight was to be considered as earned could be used. The only case which the government has cited that appears to hold that such an agreement must be express and unambiguous before it can be valid is found in Benner v. Equitable Safety Insurance Company, 6 Allen (Mass.) 222 (1863).

In The Laurent Meeus, 133 F.2d 552, 558 (9th Cir. 1942) the Court quotes approvingly from an English case wherein it is stated:

> "By the policy of the law of England freight and wages, strictly so called,

do not become due until the voyage has been performed. But it is competent to the parties to a charter party to covenant by express stipulations in such manner as to control the general operation of law. The question in this case is whether the parties have not so covenanted by the stipulations of this charter party. If the charter party be silent, the law will demand a performance of the voyage; for no freight can be due until the voyage be completed. But if the parties have chosen to stipulate by express words, *or by words not express, but sufficiently intelligible to that end,* that a part of the freight (using the word 'freight') should be paid by anticipation, which should not depend upon the performance of the voyage, may they not so stipulate? * * * And there can be no doubt that the payment of freight may by the agreement of the parties be so exempted."

The parties stipulated that parol evidence would be admissible for the purpose of determining the meaning of the clauses in question. The pretrial order entered herein on June 6, 1966, and signed by counsel of record and the court, provided:

> "7. (b) Parol evidence and oral testimony by deposition or otherwise may be offered by the Libellants or the Respondent or both without objection by either party that such evidence should not be admitted in determining the construction, meaning and effect of any written provisions of the Contracts in question."

Such a stipulation suggests that ambiguity exists. As will be hereafter discussed, the words employed are susceptible of meaning that the 80% prepaid freight was "completely earned". This conclusion is more harmonious with the rule in *The Laurent Meeus* and rejects the contention that the fact of ambiguity itself compels that, as a matter of law, freight must be considered as unearned.

▓ Even if the government had not stipulated to the admissibility of

parol evidence, there is further reason for distinguishing the *Benner* case. Public policy considerations bear more heavily on the construction of bills of lading and other contracts of common carriage than upon privately negotiated charter agreements. The requirement of some express, unambiguous statement that freight is to be considered as earned might be more equitable in a bill of lading where rates are set by tariff and where there is a duty to carry the goods. In a charter party agreement, the parties may negotiate for provisions of their own choosing. In The Laurent Meeus, supra, 133 F.2d at 558, it is stated:

"In charters it [provision for prepayment of freight without refund] is presumably a factor in bargaining between owner and charterer. The charterer may claim a lesser freight charge because the cost of insurance of the freight is borne by him and not the owner."

The instrument before the Court in this action computes payment of the freight charge on the basis of cubic feet in use, and therefore appears to be a space charter of a portion of the vessel. The negotiated rates were less than plaintiff's tariffs when engaged in similar movements as a common carrier. Whereas there may be some justification in applying the strict requirement of express and unambiguous language declaring freight to be earned in a bill of lading, as was stated in the *Benner* case, this Court does not find such stringent requirement controlling the construction of a private charter party agreement. It must be borne in mind that the government's position as charterer does not place the owner of the vessel in the status of a common carrier. Burn Line v. United States & A.S.S. Co., 162 F. 298 (2d Cir. 1908); The Fri, 154 F. 333 (2d Cir. 1907). The parties are free to adopt whatever terms they choose. This court will not declare freight unearned simply because no *express* intent to the contrary appears on the face of the instrument. There is an inference in the words employed, which gives rise to the ambiguity. Resolution of the ambiguity can be made only after evaluation of the parol testimony adduced for the purpose of rendering the language of the charter party "sufficiently intelligible".

Mr. W. C. Kelly, a former vice president of Waterman, attended the preliminary negotiations between representatives of the commercial shipping industry and MSTS. It was his understanding that the payment provisions of the MSTS charter were to provide for 80% earned freight as opposed to the 100% earned freight that the industry had formerly enjoyed under the superseded Army Space Charter. According to this witness, the prepaid 80% was earned and nonreturnable and the remaining 20% was to be retained as a cushion to absorb potential claims for breakage, spillage, shortages, etc., of cargoes which might ultimately be delivered at the ports of discharge.

It must be remembered that General Average adjusting is a highly specialized field. Most often, differences are resolved by specially trained adjusters in non-legal forums. Consequently, judicial interpretation of general average adjustments is rare. This Court therefore finds that the opinions of General Average Adjusters are significant in a case such as this.

Mr. J. H. Lyons, the General Average Adjuster who prepared the adjustment in this case, stated that he had always construed the phraseology at issue in this case to mean that the 80% prepaid freight was earned and non-returnable.

An expert witness who testified for the plaintiffs, Mr. J. Robert Hunter, former Chairman of the Executive Committee of the Association of Average Adjusters of the United States, testified that in his opinion, as an expert in the field of average adjustment, the wording of the payment clauses of the MSTS contract would require a general average adjuster to construe the phrases in question as meaning that

80% of the freight was prepaid and earned and was therefore at the risk of cargo, not of the vessel. Mr. Gossett McRae, Vice President of International Ship Brokers, Inc., arrived at a similar conclusion.

 There was evidence to the effect that on a number of occasions prior to the institution of this suit, Waterman had accepted the MSTS interpretation of this issue in settling other General Average adjustments. The government takes the position that such prior action constitutes an estoppel to Waterman to assert its claim in this proceeding. This Court does not so find. There were other factors and considerations which influenced Waterman's acceptance of the MSTS construction of these clauses on prior occasions.

 The evidence discloses that the contracts were written by the government. The government enters into purely commercial contracts, such as this one, on the same footing as any private contracting party. Grace Line v. United States, 144 F.Supp. 548 (S.D. N.Y.1956); aff'd 255 F.2d 810 (1958). The basic law applicable to the authorship of contracts is as follows:

"It is a general rule of construction that where a contract is ambiguous it will be construed most strongly against the party preparing it or employing the words concerning which doubt arises * * *." 17A C.J.S. Contracts § 324, p. 217 (1963). Alcoa S.S. Co. v. United States, supra.

Therefore, this Court concludes that the provisions in question render 80% of the freight as earned and the cargo interest must bear 80% of the loss as to such freight.

The amount in controversy is stipulated in the pretrial order as $11,964.84, plus such interest as the Court may allow.

A decree in accordance herewith will be this day entered.